REINES DISTRIBUTORS, INC., etc.,
Plaintiff,

v.

ADMIRAL CORPORATION et al.,
Defendants,

v.

EMPIRE STATE INSULATION CO., Inc.,
et al., Additional Defendants on
Counterclaims.

Civ. No. 143–263.

United States District Court
S. D. New York.

July 22, 1966.

See also D.C., 39 F.R.D. 39.

Landis, Carrow, Bernson & Tucker, and Nathan Shapiro, New York City, for plaintiff, Berthold H. Hoeniger, New York City, of counsel.

O'Brien, Driscoll & Raftery, New York City, for defendant Admiral Corp. and others, George A. Raftery and William D. Friedmann, New York City, of counsel.

METZNER, District Judge.

Plaintiff, a franchised distributor of the products manufactured by defendant Admiral Corporation, asserts claims under sections 2(a), (d) and (e) of the Clayton Act (Robinson-Patman Act), sections 1 and 2 of the Sherman Act, and for breach of contract.

Plaintiff originally moved for a seprate trial of the issue as to whether Newark was a purchaser or customer within the meaning of the Robinson-Patman Act, or a distributor within the meaning of the distributor contract between plaintiff and defendant. This motion was granted in order to facilitate the trial of the case. See 257 F.Supp. 619 (S.D.N.Y.1965). Subsequently the issues to be tried were framed in a pretrial order jointly proposed by the parties and filed May 11, 1966. In the first instance the court was to determine three separate issues, the court's analysis of which is set forth below.

From January 1, 1957 to December 31, 1957 and from January 31, 1959 to March 31, 1959 (the latter date approximating the termination of the relationship between plaintiff and Admiral), Admiral distributed its products in the metropolitan area of New York City through a division called the Newark branch. From January 1, 1958 to January 30, 1959 the Newark branch was incorporated with other branches into a wholly owned subsidiary of Admiral.

**I**

The first issue is whether from January 1, 1957 to December 31, 1957 and from January 31, 1959 to March 31, 1959 Newark (then operated as a division of Admiral) was a "purchaser" from Admiral within the meaning of sections 2 (a) and 2(e), and a "customer" of Admiral within the meaning of section 2(d) of the Clayton Act, as amended by the Robinson-Patman Act.

For convenience the court will use the word "purchaser" to encompass both "purchaser" and "customer" within the meaning of the act. American News Co. v. FTC, 300 F.2d 104, 109 (2d Cir. 1962).

The issue as to whether a "division" of a corporation can be a purchaser for Robinson-Patman Act purposes appears to cover untilled ground. See Syracuse Broadcasting Corp. v. Newhouse, 236 F. 2d 522, 527 (2d Cir. 1956). Unlike the relation between a subsidiary and a parent, the nexus between a division of a corporation and the corporation has no legal significance vis-a-vis taxing authorities, creditors, or as regards risk of loss. Under the Sherman Act, there has been a district court holding that because the division of a corporation is for all external purposes part of the corporation itself, the division cannot conspire with the corporation for purposes of section 1 of the Sherman Act. Deterjet Corp. v. United Aircraft Corp., 211 F.Supp. 348 (D.Del.1962). See Timken Roller Bearing Co. v. United States, 341 U.S. 593, 606, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) (Justice Jackson's dissenting opinion indicates that Government conceded this point); Att'y Gen. Nat'l Comm. Antitrust Rep. 35 (1955) ("there would concededly be no liability"). Cf. Zelinger v. Uvalde Rock Asphalt Co., 316 F.2d 47, 52 (10th Cir. 1963); Mackey v. Sears, Roebuck & Co., 237 F.2d 869 (7th Cir. 1956); Nelson Radio & Supply Co. v. Motorola, 200 F.2d 911 (5th Cir. 1952). Compare Poller v. Columbia Broadcasting System, 368 U.S. 464, 469 n. 4, 82 S.Ct. 486, 489, 7 L.Ed.2d 458 (1962) ("do not pass upon the point"). While this position seems logical in Sherman Act cases, the focus here is on the purposes of Robinson-Patman and the substance of the relevant transactions in this case in relation to those purposes. Cf. Brennan, The Sherman Act and Multi-Corporate Traders: Competition Among Affiliates, 100 U.Pa.L.Rev. 1006, 1010 (1952).

Several cases in dealing with the problem of whether a purchase has occurred within the meaning of Robinson-Patman look exclusively to indicia of sales law and transfer of title. See, e. g., Students' Book Co. v. Washington Law Book Co., 98 U.S.App.D.C. 49, 232 F.2d 49 (1955), cert. denied, 350 U.S. 988, 76 S.Ct. 474, 100 L.Ed. 854 (1956) (upheld jury finding of consignment); Loren Specialty Mfg. Co. v. Clark Mfg. Co., 241 F.Supp. 493 (N.D.Ill.1965). But cf. Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964) (Sherman Act §§ 1, 2). If such an approach were taken here, the conclusion is clear that the answer to the question posed is "no", as title does not pass for sales law purposes when goods are transferred within the same corporation.

It has been plaintiff's contention, however, that since the division functioned during 1957 and the first three months of 1959 in the same manner as when it was a corporate subsidiary in 1958, the court should look to substance rather than form and find that Newark was a purchaser throughout the period. The court agrees that substance rather than form should govern. This leads to a consideration of the intracorporate relationships during the periods that Newark was a division.

**584**

There is no proof that Newark held itself out to be separate and apart from Admiral Corporation. Compare Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 215, 71 S.Ct. 259, 95 L.Ed. 219 (1951). Moreover, the operation of the business was interlocked with the home office in Chicago to such a degree that Newark could not be deemed a separate entity. The division was headed by a branch manager under the jurisdiction of "Head of Branches" located in Chicago. It was staffed by an accounting department headed by an accounting manager who was subject to the authority of both the branch manager and the central branch accounting office in Chicago. There was also a branch credit manager accountable to both the branch manager and to the central branch credit department in Chicago. Lines of credit extended to retailers needed approval from Chicago. Labor relations and real estate transactions of Newark were handled through Chicago.

Merchandise was usually shipped to the warehouse in Newark and stored there until sold to the dealers. The merchandise was invoiced to Newark, and this served the purpose of internal bookkeeping to show where the merchandise was. Newark had a separate set of books which was separately audited by a firm of accountants who audited all the books of Admiral and its branches. The separate set of books allowed Admiral to know just how efficiently its branches were operating since the invoice price from Chicago was a purchase entry and Newark's invoice to its dealers a sales entry. A bank account was maintained in Newark, but it was under the control, in the main, of the home office, to which the monthly statements were sent. Newark had no funds of its own and checks of dealers to Newark for payment

of merchandise were deposited in this account. Newark did not merely turn over to Chicago Admiral's invoice price to Newark, but rather the money in the account was disbursed by the home office as it saw fit. For example, Chicago transferred monies from the bank account of one branch to another as necessary. Newark's payroll was made up in Chicago and sent to the branch for delivery to the employees.

The branch manager generally had to take the merchandise that was given to him and had less power than an independent distributor to reject merchandise. Prices were fixed for Newark by Chicago, except that within certain categories the branch manager did have some flexibility in setting prices. Nevertheless, he could not dump goods on the market for quick sale.

The sections involved herein of the Robinson-Patman Act when considered in relation to injury to competitors of a favored buyer (the so-called secondary line competition case) seem directed at discrimination by a seller caused by the size and strength of an independent buyer. See S.Rep.No.1502, 74th Cong., 2d Sess. 1–8; H.R.Rep.No.2287, 74th Cong., 2d Sess. 1–20; FTC v. Anheuser-Busch, Inc., 363 U.S. 536, 544 & n. 7, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960); FTC v. Henry Broch & Co., 363 U.S. 166, 174, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960). Compare 15 U.S.C. § 13a and FTC v. Anheuser-Busch, Inc., supra, 363 U.S. at 546, 80 S.Ct. 1267 (injury to competitors of seller, primary line case). The Robinson-Patman claim asserted here was not meant to turn on the bookkeeping practice of a single corporate entity, which is all that plaintiff has shown here to indicate independence of the branch.[1] Newark was neither a purchaser nor a

---

1. See Hearings Before the Judiciary on H.R. 8442, H.R. 4995, H.R. 5062, 74th Cong., 1st Sess. 9 (1935). (While the bill being discussed was H.R. 4995 and the bill passed by the same Congress was H.R. 8442, the pertinent wording was the same in both bills. The person making the analysis, Mr. Teegarden, is credit-

ed with drafting this bill and the final bill. See Rowe, The Evolution of the Robinson-Patman Act: A Twenty-Year Perspective, 57 Colum.L.Rev. 1059, 1068 n. 44 (1957). Mr. Teegarden specifically indicated interdepartment transactions were not discovered.)

customer during the period that it was a branch or division of Admiral.

## II

The second issue is whether for the calendar year 1958 Newark (then a part of Admiral Distributing Corporation) was a "purchaser" from Admiral Corporation within the meaning of sections 2(a) and 2(e), and a "customer" of Admiral Corporation within the meaning of section 2(d) of the Clayton Act, as amended by the Robinson-Patman Act.

In 1958 Newark, along with other branches, was incorporated in a wholly owned subsidiary of Admiral known as Admiral Distributing Corporation. Certain tax advantages to the parent were the reason for adopting the corporate form. In 1959, when there was no longer any tax advantage to having a separate distributing corporation, Newark was re-established as a branch. The proof shows that the methods, procedures and controls of Admiral over Newark, as set forth above, did not differ in the corporate period from the branch period. Five of the six officers and directors of the distributing corporation were officers of the parent. While there was technically a sale for purposes of sales law when goods flowed between parent and subsidiary, for purposes of Robinson-Patman the transaction would seem identical with the 1957 and 1959 period.

The Supreme Court has cautioned to hold "substance over form" in antitrust cases. United States v. Yellow Cab Co., 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). Following that principle in the Robinson-Patman area, the courts and the Federal Trade Commission have carefully analyzed the situation when a purchaser brings a claim against parent and its subsidiary alleging a Robinson-Patman violation and asserting in support that the parent and subsidiary are the same seller for Robinson-Patman purposes. See Baim & Blank, Inc. v. Philco Corp., 148 F.Supp. 541 (E.D.N.Y.1957); Rowe, Price Discrimination Under the Robinson-Patman Act 53-56 nn. 35-42 (1962) & Supp. nn. 35-42 (1964). As indicated in *Baim & Blank, Inc.*, supra, the corporate veil between parent and subsidiary distributor will be disregarded when control asserted by the parent is significant and they will be regarded as the same seller for Robinson-Patman purposes. It is clear from the facts in this case that Newark could not be regarded as a separate seller from Admiral Chicago for Robinson-Patman purposes.

In *Baim & Blank, Inc.*, supra, the court on a motion for summary judgment by the defendant held Philco Corporation and Philco Distributors, Inc. to be separate sellers. From the evidence referred to there, the court found that Philco Distributors, Inc. had sole control of its prices. The evidence here has been more extensive, and aside from the fact that Newark did not have complete control over its pricing policy, the parent exercised dominion and control in other significant ways. Dominion and control is an essential factor in determining the relationship. See prior opinions in this case, 257 F.Supp. 619 (S.D.N.Y.1965); 241 F.Supp. 814, 815 (S.D.N.Y.1964), and *Baim & Blank, Inc.*, supra. Cf. American News Co. v. FTC, supra; Western Fruit Growers Sales Co. v. FTC, 322 F.2d 67 (9th Cir. 1963); Loren Specialty Mfg. Co. v. Clark Mfg. Co., supra; Kraft-Phenix Cheese Co., 25 F.T.C. 537, 542 (1937).

Plaintiff urges that Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, supra, and Timken Roller Bearing Co. v. United States, supra, require that for the year 1958 Newark must be held a purchaser. Those cases, however (aside from the fact they dealt with a quite different antitrust problem—conspiracy by a parent and subsidiary to violate section 1 of the Sherman Act) are not at counterpoint with the result reached here. It would seem that in the proper factual context a subsidiary of a parent could be a purchaser for Robinson-Patman purposes. See Danko v. Shell Oil Co., 115 F.Supp. 886 (E.D.N.Y.1953) (on motion to dismiss complaint court deemed such a claim possible). *Kiefer-Stewart* and

*Timken* are not to be applied without careful analysis of the facts in a specific case and the purpose of the antitrust act involved. See Syracuse Broadcasting Corp. v. Newhouse, 319 F.2d 683, 686–687 (2d Cir. 1963). Most commentators who have focused on the question of the application of the Robinson-Patman Act to intracorporate transactions seem to agree that unless the corporate entities deal at arm's length no sale in economic terms can be discovered. See Birell, The Integrated Company and the Price Squeeze Under the Sherman Act and Section 2(a) of the Clayton Act as Amended, Vol. IX, A.B.A. Rep., Section of the Anti-Trust Law 49, 66 (1956); Schwartz in Van Cise & Dunn, How to Comply with The Antitrust Laws, Control of Affiliates, 234, 244 (1954); Comment, 53 Nw.U.L.Rev. 253, 267 (1958); cf. Adelman, Effective Competition and the Anti-Trust Laws, 61 Harv.L.Rev. 1289, 1314 (1948). Compare Sheehy, Implications of Intra-Enterprise Conspiracy Doctrine in Clayton Act Sections 2 and 3 Cases, Vol. VIII, A.B.A. Rep., Section of the Anti-Trust Law 83 (would explore realistic effect on competition, notes other remedies for price squeeze).

If plaintiff was injured by the practice of a deliberate price squeeze exercised by Admiral performing a distributing function, it would seem that it is not necessarily without remedy. See 15 U.S.C. §§ 1, 2; United States v. Aluminum Co. of America, 148 F.2d 416, 436 (2d Cir. 1945) (Sherman Act, section 2 remedy in part based on price squeeze); Krug v. International Telephone & Telegraph Corp., 142 F.Supp. 230 (D.N.J.1956) (violation of Robinson-Patman may be predicated on manufacturer selling to retailer at lower price than to distributor). For a possible FTC proceeding see 15 U.S.C. § 45(a), United States Steel Corp., 8 F.T.C. 1 (1924).

■ A legal remedy must be an effective check and be directed at the facts comprising the legal injury claimed. Nothing, however, has been offered in evidence to show that there was any dif-ference in relationship between Admiral Chicago and its Newark distributor in 1957, 1958, or 1959, except that during 1958 Newark was part of a separately incorporated subsidiary. The facts show why it would be meaningless to find Newark a purchaser from Admiral during the 1957 and 1959 periods when Newark was a branch. Truly it would be placing form over substance to hold Newark a purchaser for 1958.

### III

The third issue is whether during the two periods covered by I and II above Newark was a "distributor" of Admiral within the meaning of paragraph A(3) of the distributor contract between plaintiff and Admiral.

Apart from its antitrust claims, plaintiff asserts a claim for breach of contract. Plaintiff and defendant differ about the meaning of clause A(3) of the distributor contract, which vested in plaintiff the right to be a franchised Admiral distributor during the operating period of the agreement. Paragraph A (3) reads as follows:

> "PRICES (3) Admiral's prices to Distributor shall be the same as are from time to time current and applicable to its other distributors, which prices shall be subject to change without notice."

■ The contract contains a provision that it is to be construed by the law of Illinois, where the contract was executed and Admiral has its principal place of business. Therefore, it is necessary to look to Illinois law to construe the contract.

■■ Under Illinois law unless a contract is ambiguous, evidence external to the agreement is not to be considered. Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d 641, 646 (3d Cir. 1958). The contract itself contains a merger clause stating that prior understandings are not binding unless contained in the contract. The plaintiff has the burden of showing the contract to be ambiguous.

The ambiguity, if it does exist, centers about the words "other distributors".

The question is whether those words encompassed Newark in either period.

Defendant contends that the words refer only to independent distributors such as plaintiff. Various clauses in the contract sustain defendant's interpretation. The clauses demonstrate that throughout the contract it is only an independent distributor who is referred to. Clause A(2) limits claims for damage. Clause A(4) gives the distributor the right to make a limited use of Admiral's name. The independent can only indicate that it is an authorized distributor, but may not use its own name in connection with Admiral. As applied to a branch, this clause is meaningless. When Reines Distributors, Inc. entered the contract Admiral's Newark division clearly could use the Admiral name, since it was part of the corporation. During the 1958 period, when Newark was part of a subsidiary of Admiral Corporation, the name of the company was Admiral Distributing Corporation. Clause B(8), which gives Admiral permission to examine books and records of distributors, would be wholly unnecessary as regards Admiral branches. The same could be said of clauses B(9)d (permission to conduct operations through a subsidiary) and B(12) (indemnification on certain kinds of lawsuits). Clauses C(2)–(5), which refer to the termination of the contract, further illustrate that the word "distributor" refers only to independently owned distributors. Finally, clause A(3) itself uses the word "prices", which in 1957 would be meaningless as applied to the Newark branch.

Only by interpreting A(3) to mean that Admiral would not itself sell to retailers at prices lower than an independent distributor could (taking into account Admiral's prices to that distributor) can plaintiff's construction be logically tenable. While such a clause would no doubt be helpful to plaintiff, it is clear that A(3) does not go that far.

If the court were to turn to external evidence, there is a diametric clash between plaintiff's and defendant's witnesses on what they thought the contract meant. This seems an appropriate situation where a contract viewed as a whole can speak for itself. The contract indicates that the "other distributors" referred to in A(3) were the independent distributors only.

## IV

The pretrial order which framed the issues to be tried separately provided that if the answer to the first three issues was in the negative then the court was to try two additional issues.

The first of these was whether certain named customers of Newark were "purchasers" or "customers" within the meaning of Robinson-Patman. Defendant admitted that these customers purchased from Newark at various times during the relevant period. However, defendant claims that they did not act as distributors so as to come within the purview of the act. This was the issue that was tried. Plaintiff offered proof to show that such customers acted as distributors and sold to retail dealers and a transshipper in plaintiff's territory. Some 14 customers are alleged to have acted as such distributors. Only three were called upon to testify.

Trevor, who conducted a wholesale-retail appliance business, testified without contradiction that at the request of an Admiral salesman he tried to sell Admiral products (which he was to receive at a good price) in plaintiff's territory, but was successful in a very limited way. He sold only about 15 TV sets to one purchaser in Port Ewen, New York. His gross yearly sales were $1,-700,000, of which 80% was sold at wholesale. Only $6,610 worth of merchandise in the period was purchased from Newark. About $13,000 worth of Admiral products was purchased from other sources independent of Newark.

The second witness was the president of Sunset Appliance Stores. They did a yearly business of $10,000,000 to $12,-000,000, of which $1,000,000 was wholesale. They bought between $400,000 and $500,000 worth of merchandise a year from Admiral, and of this $20,070 worth

of Admiral merchandise was sold to a transshipper in plaintiff's territory during the period. Some additional Admiral merchandise was sold at wholesale by Sunset, but the amount was unknown. There is no proof, however, that Admiral knew of these sales. In fact, the witness testified that Newark's branch manager told him not to sell to dealers or to transshippers, although the manager knew he was selling other lines at wholesale.

The final witness was the vice president of Silo, which engaged in selling appliances in the Philadelphia area both at wholesale and retail. Their average yearly sales in 1957–1958 were $4,000,-000, of which $1,000,000 was at wholesale. During the period November 1, 1958 to February 28, 1959 Silo sold $350,000 worth of merchandise at wholesale, and for the period September 1958 to February 27, 1959 it purchased $166,-890.83 worth of merchandise from Admiral. $4,340 worth of merchandise was sold in that period to a transshipper in Albany. The merchandise was picked up in Philadelphia by the purchaser and the witness did not know its ultimate destination.

 Since Trevor and Silo engaged in relatively large wholesale activities, they performed a distributive function. To a limited extent this applied to Admiral products. Therefore, the answer to the issue under discussion is in the affirmative only as to these two customers. Under the evidence Sunset cannot be considered a distributor of Admiral products.

The proof as to possible competition was not relevant at this stage of the litigation. We are solely interested in status in the Robinson-Patman issues tried thus far.

The second of these issues under the second phase of the trial was whether the named customers of Newark were "distributors" within the meaning of the distributor contract between plaintiff and Admiral.

The pertinent provision of that contract, paragraph A(3), is quoted above and refers to Admiral's prices "to its other distributors". A distributor is not defined in the contract. However, it is clear that Admiral, by a course of conduct, could create a distributor relationship with an independent without a formal contract. Thus, in contradistinction to the relationship between Admiral and Newark, arm's length, normal buyer-seller dealing with readily definable sales transactions creates such a relationship.

In the case of Trevor, 80% of whose business was wholesale, Admiral asked him to sell in plaintiff's territory. 25% of Silo's business was wholesale, and while the proof is thin regarding this company, I find that it, too, could be considered a distributor under the contract. Insofar as Sunset is concerned, a different situation obtains. Only 10% of Sunset's business was wholesale, and even though Admiral knew that it sold at wholesale, Admiral cautioned Sunset against selling its line of products to dealers or transshippers. On the record I find that Sunset cannot be considered a distributor under the contract.