**Paul SCHABEN d/b/a Schaben Distributing Company and Bernard Schaben d/b/a Schaben Distributing Company, Inc., Plaintiffs,**

v.

**SAMUEL MOORE AND COMPANY, a corporation, Defendant.**

Civ. No. 75–24–W.

United States District Court,
S. D. Iowa, W. D.

Dec. 21, 1978.

Donald E. O'Brien, O'Brien, Galvin & O'Brien, Sioux City, Iowa, Bruce Rohde, McGrath, North, O'Malley, Kratz, Dwyer, O'Leary & Martin, P. C., Omaha, Neb., for plaintiffs.

Frank W. Pechacek, Jr. and Gregory G. Barntsen, Smith, Peterson, Beckman & Willson, Council Bluffs, Iowa, for defendant.

## MEMORANDUM OPINION AND ORDER

STUART, Chief Judge.

On July 15, 1975, plaintiffs' petition was filed with this Court seeking treble damages for alleged discriminatory pricing and other predatory and monopolistic practices in violation of 15 U.S.C. §§ 1, *et seq.* On June 14, 1978, the complaint was amended to reflect, *inter alia*, damages in the amount of $6,895,736.70 and $38,453,469.00 for plaintiffs Paul and Bernard Schaben, respectively. Defendant filed a counterclaim on June 14, 1978, to recover the outstanding balance on Paul Schaben's account. The matter came on for trial before the Court on Thursday, June 22, 1978 at Council Bluffs,

Iowa. Appearing for plaintiffs were Donald E. O'Brien and Bruce Rohde; representing defendant Samuel Moore & Company [Samuel Moore] were Frank W. Pechacek, Jr. and Gregory G. Barntsen. Evidence was concluded and the case taken under advisement on June 30, 1978. After having heard the evidence and examining all matters submitted, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Plaintiff Paul Schaben is a resident of Carroll, Iowa, doing business as Schaben Distributing Co., Inc., with his principal place of business in Carroll County, Iowa. Bernard Schaben, his brother, resides in Dunlap, Iowa. During the time at issue he conducted business independently but also used the name of Schaben Distributing Co., Inc. His principal place of business was in Pottawattamie County, Iowa. Defendant Samuel Moore is an Ohio corporation licensed to do business within the State of Iowa, having its principal place of business in Mantua, Ohio. Jurisdiction herein is premised on 28 U.S.C. § 1332 and § 1337.

Prior to the events giving rise to this lawsuit, plaintiffs were self-employed in the business of selling and distributing nuts, bolts, washers, small tools, and similar items to the farm aftermarket in Iowa, Nebraska, and the surrounding states. On June 30, 1970, plaintiffs met with Jack Radabaugh, midwest regional sales manager for the Synflex Division of Samuel Moore [Synflex] to discuss the possibility of the Schabens becoming Samuel Moore distributors, particularly of the Synflex line of plastic hydraulic hose and the accompanying couplings, dies, pushers, and swaging tools. During the course of this initial meeting, some discussion was had as to where plaintiffs should direct their primary selling and promotional efforts. Mr. Radabaugh was aware that plaintiffs called directly on farmers and implement dealers and the plaintiffs left the meeting with the understanding that they should concentrate primarily on the agricultural trade. However, no exclusive territory of any kind was offered plaintiffs. Synflex also wanted them to develop the industrial market in their areas.

The plastic hydraulic hose was a relatively new concept in the farm aftermarket which had been dominated by rubber wire braid hose, so plaintiffs were given a demonstration by Mr. Radabaugh. Bernard Schaben was particularly impressed with the flexibility and durability of the Synflex hose and he placed a small trial order for the hose and related attachments. On August 4, 1970 he commenced selling the Synflex line along with the other products he had previously carried. On April 3, 1971, Paul Schaben began selling Synflex products.

At the outset, customers did not readily accept the plastic synthetic hose. The Schabens expended a great deal of time promoting the Synflex line and the market for those products gradually increased. While Paul Schaben concentrated his efforts largely within the State of Iowa during this period, Bernard expanded from his original base in Nebraska into the States of Wyoming, Kansas, and Colorado. Several sales people were employed to service accounts by 1974.

Samuel Moore utilizes a nationwide, multi-unit distribution system. Its company policy prohibits the granting of exclusive distributorships. As a result, there may be several distributors in the same general trading area selling the same products in direct competition with each other. Samuel Moore representatives are not allowed to accompany one distributor to an account serviced by another distributor. However, the company does not prohibit individual distributors from calling on a previously established account. Samuel Moore has five different pricing levels within its distribution network, with the various price lists color-coded according to the level of distribution. Large and small original equipment manufacturers (OEMs) purchase products at blue or green sheet prices; distributors receive goods at the next lowest or "pink sheet" price; jobbers [dealers] receive yellow sheet prices; and end-users pay

white sheet prices. The white sheet retail price list employs a three-tier quantity breakdown scheme with the last column, white sheet price being the lowest offered to users for large quantity purchasers. The lists issued by Samuel Moore operate only as recommended price guides. Dealers and distributors do not always follow Samuel Moore's white sheet prices due to the demands of competition. No sanctions are applied to those who deviate from the suggested prices.

As Synflex distributors, the Schabens received their goods at pink sheet prices with adjustments for quantity orders and prompt payment. Although Paul and Bernard Schaben both testified that during their first years with Synflex they were instructed to charge last column white sheet prices less 5% for payment by the 10th to dealers or jobbers and did so frequently, they also appear to have set their own prices. They employed a graduated price scale for five categories of buyers: (1) sales personnel/jobbers, (2) employees, (3) dealer-users, (4) dealers, and (5) end-users. They also offered a special price on their "farm and ranch kits", a package deal offered as a merchandising tool. The matter of pricing policy was discussed several times with plaintiffs throughout the course of their business relationship with Synflex. Plaintiffs adamantly deny that they were ever instructed to charge dealers and/or users yellow sheet prices or that they were advised their prices were too high. However, the Court finds that they were approached on more than one occasion with the suggestion that they consider lowering their prices to bring them in line with the recommended pricing levels but they did not do so.

In 1973 another competitor, Couplamatic, Inc., entered the hose market being served by plaintiffs. Couplamatic, a wholly-owned subsidiary of Samuel Moore, is headquartered in Lyman, Nebraska, and manufactures couplings, dies, adaptors and other hose accessories. It also operates as a coupler of rubber braid and synthetic hose. Shortly after its acquisition by Samuel Moore in 1969, Couplamatic commenced selling Samuel Moore products through its independent distributors. Initially it was intended that Couplamatic would focus on the agricultural trade while Synflex would concentrate its efforts in the industrial market.

Although Couplamatic is a separate corporation, it functions and is treated as a division of Samuel Moore. Consolidated financial statements and a single tax return are filed. The consolidated reports do not separate the gross margins and net profits of Couplamatic from the other divisions of Samuel Moore. The same Board of Directors controls Couplamatic, Synflex and Samuel Moore. Attempts are made to coordinate corporate activities. There is a constant dialogue between them regarding product improvements and means of expediting supply and transfer. However, Synflex and Couplamatic each employ their own independent distribution system, factory representatives, sales managers and administrative staff. The two entities themselves possess no real working knowledge of the day-to-day activities of the other. They ostensibly have separate pricing schemes but in actual practice, Couplamatic follows Synflex suggested price lists. Thus, although the companies are separate for purposes of day-to-day corporate operation, the overall policies are determined by and are under the direction of Samuel Moore. Couplamatic, in effect, functions as a profit center or division of Samuel Moore.

There was some dissatisfaction among Couplamatic management with the independent distributor form of distribution and in mid-1972 plans were formulated to institute a wagon jobber, direct sales program, to increase profitability by moving one step closer to the ultimate buying influence and intensifying market penetration. Initially Couplamatic did not contemplate selling the Synflex line of plastic synthetic hose through its wagon jobbers. Two men were hired in January of 1973 to initiate the Couplamatic direct sales program in Nebraska and Colorado. Some time into their six-month training period, however, Couplamatic decided to include Synflex hose in the direct sales inventory. The hose was identi-

cal to that being distributed by plaintiffs with the exception of its color and name. Synflex is black and is stamped "Samuel Moore". Couplamatic hose is blue and bears the name "Couplamatic". Couplamatic wagon jobbers were instructed to sell the hose line at yellow sheet jobber prices, less a 2% cash discount for payment by the tenth of the month. They were not given any authority to undercut that price.

Synflex manufactures the synthetic hose and Couplamatic manufactures the couplings and other related hardware. In order for both of them to have a full line, each transfers the items it manufactures to the other at manufacturer's cost plus an "add-on" which depends upon the profitability of the particular item. Thus Synflex receives a greater profit on sales to its distributors than it does on transfers to Couplamatic and Couplamatic receives a greater profit on sales to its distributors than it does on transfers to Synflex. As long as the prices to the distributors are the same, the overall profit to Samuel Moore is the same whether the sales are to Couplamatic or Synflex distributors. However, when Couplamatic through its wagon jobbers sells to dealers or final users, Samuel Moore's profit is greater because the sale price (yellow sheet) is higher than distributor's price (pink sheet).

Samuel Moore monitors each division or subsidiary separately and keeps records of all inter- and intra-corporate transfers. Synflex sales personnel are compensated on a salary plus commission basis on sales to the distributors. They receive no compensation whatsoever on transfers to or sales by Couplamatic. Overall corporate policy does not favor transfers between Synflex and Couplamatic over their own distributors nor does it favor Couplamatic wagon jobbers over its distributors or transfers to Synflex.

Plaintiffs first became aware of the new Couplamatic wagon jobber program in May of 1973 at the annual farm show in Kearney, Nebraska. The Couplamatic trucks had not formally begun calling on accounts and they were still displaying only rubber wire braid hose. The first two wagon jobbers went on the road on June 3, 1973 with the Synflex line and a list of prospective buyers compiled from Dunn and Bradstreet. Included therein were a number of the Schabens' customers. Plaintiffs were not officially advised of Couplamatic's entry into the direct sales market by Jack Radabaugh until a July 11, 1973 meeting in Des Moines, Iowa. At that time plaintiffs were told that Couplamatic would begin selling plastic synthetic hose in late 1973 or early 1974 at yellow sheet prices, although Couplamatic was already carrying Synflex hose. Plaintiffs expressed some dissatisfaction at this prospect, particularly with the prices Couplamatic apparently anticipated charging. Samuel Moore's recommended pricing system was again explained to plaintiffs with the suggestion they consider following it in order to compete more effectively.

Both Schabens sold almost exclusively to the farm and ranch trade, despite the continuing efforts of certain Synflex personnel to persuade them to broaden their marketing base. Plaintiffs did not aggressively exploit these leads for varying reasons, not the least of which was their unfounded belief that Samuel Moore was attempting to divert them from the agricultural trade in order to establish Couplamatic exclusively in that area.

In mid-1973, shortly after Couplamatic entered the market, the Schabens began to experience shortages of certain essential items, primarily dies and couplings. These shortages were symptomatic of the experience of all industry during this period. Hoarding in fear of future shortages intensified the problem. Synflex discontinued quantity discounts during this period and instituted a number of contingency plans in an effort to ease the shortages. Despite such attempts, Synflex was forced to place customers' orders on hold until it eventually received delivery and could supply their needs. This, in turn, worked a substantial hardship on the Schabens. They were unable to set up new accounts or to properly service established ones.

The Schabens were not the only Synflex distributors experiencing difficulty in receiving goods ordered in a timely fashion. The Board of Directors of Samuel Moore customarily received proposed budgets and forecasts from both Couplamatic and Synflex Division, but it typically avoided making actual supply allocations. Those determinations were left to the operating management. Samuel Moore exerted pressure on Couplamatic to supply Synflex Division first, although not to the exclusion of Couplamatic customers. Thus, during the supply squeeze of 1973-74, when both Couplamatic and Synflex grossly understated their needs, the primary thrust was toward supplying Synflex's customers. Even that, however, proved insufficient to meet all demands.

During this period plaintiffs began to seek alternative sources of supply. Bernard Schaben was able to secure hardened steel dies and pushers from an independent machine shop. He purchased coupling adaptors from Cross Manufacturing and synthetic hose from Parker Hannifin. The plaintiffs also traded supplies between themselves. While the plaintiffs viewed these substitute goods as of equal—and in some cases, superior—quality, Synflex did not share that opinion, primarily due to potential product liability in the event of failure. Plaintiffs were advised of this. Couplamatic shared Synflex's reservations and instructed its wagon jobbers to pick up all unauthorized couplings and dies and replace them with Couplamatic products. That was done on at least two occasions. Paul Schaben began purchasing hose from Peerless Supply, a Synflex distributor, in late 1974, at pink sheet (distributor) prices plus ten per cent. These purchases were made, according to plaintiffs, primarily in anticipation of litigation to enable them to prove their damages in court, not in an effort to sustain their respective businesses. They are still being supplied in that manner.

The hose market experiences its key selling periods in the spring and fall. Thus, plaintiffs' supply problems were aggravated by the fact that many items were shipped piecemeal or were backordered and shipped after the peak demand period. Despite the fact that there is no credible evidence to support them, plaintiffs viewed these partial shipments and backorders as evidence of defendant's deliberate efforts to force them out of business by causing them to lose customers, forfeit quantity discounts, and incur higher prices due to interim price increases. They responded by refusing to pay for any goods until all orders were shipped or by cancelling orders. Samuel Moore, in turn, declined to ship further goods until the Schabens' accounts were current. Defendant also cancelled some orders.

The Schabens' Synflex businesses, which had steadily grown since 1971, began to deteriorate. Couplamatic, from the inception of its wagon jobber program, sold Synflex and accessories at yellow sheet prices less 2% for prompt payment. In addition, it offered various promotional and incentive features and continued its long established dealer dating program, whereby a customer was able to order projected seasonal needs several months in advance and pay for them throughout the peak demand period. Synflex offered no dating programs, although they were a common technique in the industry. Couplamatic wagon jobbers were also able to call on accounts with greater regularity than plaintiffs, particularly Bernard who had a large territory. On November 8, 1973, Port Huron, a Couplamatic distributor, notified the Schabens' accounts that it, too, would be offering the Synflex hose line at yellow sheet prices. [Plaintiffs' exhibit 44] The Schabens were compelled to institute a change in their price structure in response. They began selling to dealers at five per cent above yellow sheet price, with a five percent discount for payment by the tenth of the month, effective January 1, 1974.

Plaintiffs were experiencing other difficulties as well. Samuel Moore assigns credit limits of varying amounts to certain distributors, depending upon their credit ratings and other pertinent factors. Bernard Schaben was initially given a $5,000 credit

limit to enable him to establish a payment record; on June 22, 1971 that limit was expanded to $10,000. [Defendant's exhibit 1024] Although the record is not clear, it appears Paul Schaben's original credit limit of $3,000 [Plaintiff's exhibit 62] was also later increased to $10,000. Samuel Moore's corporate policy requires payment for all goods within thirty days of receipt. Throughout their business relationship with Samuel Moore, the Schabens maintained a sporadic credit history. They tended to accumulate large bills in excess of their credit limits, at which time they were placed on credit hold [i. e., no further goods were shipped] until their accounts were either cleared or substantially reduced. As a result Samuel Moore personnel monitored their accounts very closely. Samuel Moore exacerbated the problem by failing to promptly credit plaintiffs' accounts when they were entitled to quantity discounts and other price reductions.

Both parties made some effort to rectify this situation. Ralph Richardson, a Synflex sales representative, met with Bernard Schaben in January of 1974 at the New Tower in Omaha, Nebraska, to encourage him to send the company some money to restore his credit. William Rush, credit manager for Samuel Moore, met with Bernard in June of 1974 to discuss his delinquent account. In the early summer of 1974, Samuel Moore notified plaintiffs of its intention to cut off further shipments to either of them due to a delinquency in Paul Schaben's account. Despite the fact that the Schabens had always operated as totally separate entities with individual account sheets, Samuel Moore demanded verification of their autonomous nature before it would ship any goods to Bernard. After discussing the matter with Dave Poska, manager of industrial and distributor relations, Bernard Schaben arranged to hand deliver the verification and a check to cover his existing balance and part of a new order. He made the trip on August 14, 1974, and with Mr. Poska's assistance, picked up a large order of couplings, hose, etc. which had previously been withheld. Bernard continued to maintain an accepta-

ble account balance for several months thereafter. In October of 1974, however, he again fell behind, due in part to his frustration over the supply crunch. Both Paul and Bernard were convinced by this time that Samuel Moore was attempting to drive them out of business by undercutting their prices. Despite their awareness of Synflex's salary/commission arrangement for sales representatives, plaintiffs theorized that Jack Radabaugh and other Synflex personnel were receiving some sort of disguised compensation for their part in diverting business to Couplamatic. That belief is totally unsubstantiated. During the week of October 24, 1974, Jack Radabaugh visited with Bernard. Ed Christensen and Dave Poska approached Bernard twice in November of 1974 concerning his account. At that time he stated he had no intention of paying until all his backorders had been shipped. Mr. Poska, acting on Samuel Moore's behalf, refused to ship until all outstanding balances had been paid.

In a final attempt to salvage their relationship, Ed Christensen and Jack Radabaugh called on Bernard in January of 1975. Mr. Radabaugh hoped to introduce a new prototype hose known as Ag-Flex, 3500 series, into Bernard's product inventory as a way of encouraging him to reestablish himself as an active Synflex distributor. Bernard indicated no interest and stated that he had another source of supply. He showed them a sample of the Parker Hannifin hose and they were able to observe a large quantity of the hose warehoused at Bernard's Council Bluffs office. They left Bernard that day feeling that he no longer wanted to distribute Synflex products and that they had reached an impasse.

Bernard Schaben was terminated as a Samuel Moore distributor effective April 5, 1975 for nonpayment pursuant to the terms of the distributorship contract entered into on April 2, 1973. [Plaintiffs' exhibit 24] That contract, the second such instrument signed between the parties, provided for termination by either party upon thirty days advance written notice. By this time, Bernard Schaben had actually given up his

entire business upon the advice of his accountant.

Paul Schaben also advised Synflex that while he had the assets available to satisfy his account, he would not pay until all his backorders were shipped. [Plaintiffs' exhibits 129, 130] In effect this constituted notice of termination since he had not entered into a formal written distributor's contract with defendant. Paul Schaben has remained in business as Schaben Distributing. He currently employs his brother Bernard as a salesman and has absorbed Bernard's remaining accounts. The Schabens have continued to distribute small amounts of Synflex hose received through Peerless Supply.

Partial summary judgment was entered against Paul Schaben on March 30, 1976, by the Carroll County District Court in the amount of $48,593.65, plus five per cent interest from December 13, 1974. That judgment was discharged on May 7, 1976, by issuance of a cashier's check for $51,998.41 to the sheriff of Carroll County. [Plaintiff's exhibit 100] Judgment in the amount of $7,036.25, with interest at five per cent from August 6, 1975, was entered against Bernard Schaben on April 14, 1976, by the Pottawattamie County District Court. [Plaintiffs' exhibit 101] The counter claim herein involves items in Paul Schaben's account that are disputed and were not resolved in the Carroll County Judgment.

## CONCLUSIONS OF LAW

Plaintiffs herein urge three primary violations allegedly entitling them to relief under the anti-trust provisions of the Sherman, Clayton, and Robinson-Patman Acts: (I) that defendant engaged in illegal and discriminatory price-fixing in violation of § 2(a) of the Robinson-Patman Act [15 U.S.C. § 13(a)]; (II) that defendant's activities with regard to plaintiffs constituted unlawful termination and restraint of trade in violation of § 1 of the Sherman Act [15 U.S.C. § 1]; and (III) that defendant established or attempted to establish a monopoly in violation of § 2 of the Sherman Act [15

U.S.C. § 2]. Plaintiffs' claims under 15 U.S.C. § 45 have apparently been abandoned under the terms of the Order on Final Pretrial Conference entered by United States Magistrate R. E. Longstaff on June 16, 1978. The Court begins its analysis mindful of the fact that anti-trust litigation is largely fact oriented and undue reliance on prior cases may, therefore, be misleading. The Court carefully reviewed the evidence presented during the five days of trial and the briefs submitted in the interim and found the facts as previously set out. The Court now concludes that plaintiffs have failed to establish their claims under the law.

I

## PRICE DISCRIMINATION

Section 2(a) of the Robinson-Patman Act provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce * * * to discriminate in price between different purchasers of commodities of like grade and quality * * * where the effect of such discrimination may be substantially to lessen competition * * * or to injure * * competition * * *

In this case there is no dispute over the fact that interstate commerce was involved, that the goods were of like grade and quality, and that there was a price differential between the price charged Schaben and the cost assigned to Couplamatic. Thus, the issues are: (A) Is Couplamatic a purchaser within the meaning of Section 2(a)?; and (B) Was there an adverse competitive effect or injury as a result?

A

### Different Purchasers

■ There must be two sales to meet the "different purchasers" requirement of the Robinson-Patman Act. *Bruces Juices, Inc. v. American Can Co.*, 330 U.S. 743, 755, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947); *Snyder v. Howard Johnson's Motor Lodges, Inc.*, 412

**1330**

F.Supp. 724, 730 (S.D.Ill.1976). Samuel Moore claims there was no sale of the synthetic hose from Synflex to Couplamatic because the transactions were merely intracompany transfers, even though Couplamatic is a wholly owned subsidiary rather than a division of Samuel Moore.

■ Courts have clearly held that mere common ownership and control are not talismanic excuses for avoiding the impact of anti-trust laws, particularly where, as here, the entities involved have availed themselves of the privilege and advantages of doing business as separate corporations. *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 141–42, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). Thus, in the proper factual context, a subsidiary could be a purchaser for Robinson-Patman Act purposes. *See, e. g., Mississippi Petroleum, Inc. v. Vermont Gas Systems, Inc.*, CCH 1972 Trade Cases ¶ 73,843 (S.D.Miss.1972); *Danko v. Shell Oil Co.*, 115 F.Supp. 886 (E.D.N.Y.1953). On the other hand, where the corporate bodies involved act as a single entity, transfers between them do not qualify as "sales" nor does the recipient become a "purchaser" for purposes of finding price discrimination. *See, e. g., Reines Distributors, Inc. v. Admiral Corp.*, 256 F.Supp. 581 (S.D.N.Y.1966); *Diehl & Sons, Inc. v. International Harvester Co.*, 426 F.Supp. 110 (E.D.N.Y.1976); *Brown v. Hansen Publications, Inc.*, 556 F.2d 969 (9th Cir. 1977).

■ In determining whether a seller-purchaser relationship existed between Samuel Moore and Couplamatic, this Court must elevate substance over form. "[T]he critical factor is the exercise of domain and control over the subsidiary by the parent, not the competitive relationship. . . . There appears to be general agreement that there can be no sale under the [Robinson-Patman] Act unless the parties deal at arm's length." *Brewer v. Uniroyal, Inc.*, 498 F.2d 973, 977 n. 2 (6th Cir. 1974).

It is therefore important that the actual relationship between Samuel Moore, Synflex and Couplamatic be closely examined. Synflex is a division of Samuel Moore and Couplamatic is Samuel Moore's wholly owned subsidiary. Synflex manufactures synthetic hose. Couplamatic manufactures coupling, dies, and swaging tools used with the Synflex hose. In order for each to carry a full line of products, Synflex hose is transferred to Couplamatic at factory cost plus an "add on" set by Samuel Moore's accounting department. No cash or money in any form is exchanged. The transfers are merely bookkeeping entries. Couplamatic products are transferred to Synflex in the same manner.

Each has its own sales organization. Synflex's primary mission is to supply the industrial market. It sells to large original equipment manufacturers (OEMs) directly and uses distributors to service the remainder of the market. Couplamatic's primary mission is to supply the farm aftermarket. It does so through independent distributors and its own wagon jobbers. Synflex sets a pricing schedule for the sale of its product to various classifications of purchasers, including the ultimate user. Couplamatic follows the Synflex price schedule in the ordinary course of its business.

Synflex and Couplamatic are allowed extensive local autonomy in their respective operations; however, they do hold three joint planning meetings a year. Samuel Moore sets broad company policies applicable to Synflex and Couplamatic. It handles accounting procedures for both. The general manager of each operation is an executive officer of Samuel Moore. These two officers, thus, are the only members of the Samuel Moore Board of Directors who are employed by it or any of its subsidiaries or divisions. The Chairman of the Board, the Chief Executive Officer of Samuel Moore, and its President and chief operations officer have no direct connections with either Synflex or Couplamatic.

In accounting and financial matters Couplamatic is treated as a part of Samuel Moore. Consolidated annual reports, Form 10–K reports to the Securities Exchange Commission and income tax returns have been filed since Couplamatic was acquired. No separate figures are listed for Synflex or Couplamatic. Rather, Couplamatic is

treated as a profit center of Samuel Moore. It is the Court's opinion that under these facts Samuel Moore was operating its divisions and subsidiaries as a single entity. Samuel Moore's dominion and control over Couplamatic was so extensive that it was treated as a division rather than a separate corporation.

No cases have been found in which the "purchaser" or "sales" issue has been raised where two manufacturing divisions of a parent corporation transferred their products to each other and maintained separate sales organizations using the same pricing system. The issue has generally involved subsidiaries engaged in distribution or consumer sales. It appears that such product exchanges should be treated as intra-company transfers rather than sales. The transactions between Synflex and Couplamatic were not the result of arms length negotiations and bargaining between a typical seller and buyer.

Intra-corporate transfers are not the type of transactions the Robinson-Patman Act meant to regulate. The value at which goods are carried within the same corporation cannot affect competition between a company-owned enterprise and a licensed enterprise, nor diminish competition among similar enterprises in the relevant market.

*Snyder v. Howard Johnson's Motor Lodges, Inc.*, 412 F.Supp. 724, 731 (S.D.Ill. 1976).

### B

### Competitive Effect

■ Price discrimination is not illegal per se but, as plaintiffs note, must be coupled with a showing of a reasonable possibility that the price discrimination may have an effect on competition. *FTC v. Morton Salt Co.*, 334 U.S. 37, 46, 68 S.Ct. 822, 92 L.Ed. 1196 (1948); *Continental Baking Co. v. Old Homestead Bread Co.*, 476 F.2d 97, 103 (10th Cir. 1973), *cert. denied*,

414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218 (1973); *Janich Bros., Inc. v. The American Distilling Co.*, 570 F.2d 848, 855 (9th Cir. 1977). Even if the Court were to find that Couplamatic was a purchaser of Synflex products, it does not believe plaintiffs have adequately established a reasonable possibility of substantial injury to competition.

■ In the Court's opinion, Synflex and Couplamatic functioned on the same level. Because of the manner in which the products were cross-transferred, neither had any price advantage over the other (except for possible variation in the accountant's "add-on"). But for the different market emphasis, they and their sales forces were in competition with each other. The Schabens competed with Couplamatic's independent distributors and its wagon jobbers. Price discrimination would exist if Couplamatic sold its Synflex-like products to its distributors at a lower price than Synflex sold to the Schabens. The Court has already found that there was no price differential on that level, except for one instance early in 1975 when Couplamatic offered its distributors a twenty-five percent inventory clearance discount. The Court is unwilling to find as a matter of law, that a one-time discount constitutes price cutting in violation of § 2(a).

By eliminating the middleman through the use of wagon jobbers, Couplamatic should have been in a position to offer a better price to dealers than its distributors or the Schabens.[1] It did not do so. The evidence clearly establishes that Couplamatic did not deviate from the yellow sheet price, except for a customary prompt payment discount. There is no claim that the prices suggested for sale by distributors constituted an illegal price squeeze. In the Court's opinion the Schabens failed to show a price differential on the Schaben's competitive level that would have the required effect upon their ability to compete.

---

1. Defendant claimed the cost of doing business by wagon jobbers was too great and reduced the profit margin below that experienced by Samuel Moore's sales through distributors. No finding is made on that issue.

## II

### UNLAWFUL TERMINATION AND RESTRAINT OF TRADE

Section 1 of the Sherman Act provides in pertinent part that:

Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

Thus, in order to establish such a violation, plaintiffs must show (1) a conspiracy, combination or contract, and (2) that such is in restraint of trade.

■ The fact that the Court has found Samuel Moore and Couplamatic operated as a single entity so that Couplamatic could not be a purchaser from its parent company for the purposes of the Robinson-Patman Act, does not mean that they could not conspire together in violation of Section 1 of the Sherman Act. In *United States v. Yellow Cab Company*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), the Supreme Court held that a parent and a subsidiary can conspire. The language of *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951) is particularly appropriate here:

Respondents next suggest that their status as 'mere instrumentalities of a single manufacturing-merchandizing unit' makes it impossible for them to have conspired in a manner forbidden by the Sherman Act. But this suggestion runs counter to our past decisions that common ownership and control does not liberate corporations from the impact of the antitrust laws. *E. g. United States v. Yellow Cab Co.*, 332 U.S. 218, [67 S.Ct. 1560, 91 L.Ed. 2010.] The rule is especially applicable where, as here, respondents hold themselves out as competitors.

See also *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); *Timken Roller Bearing Co. v. U. S.*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

■ For purposes of deciding this issue, the Court will assume that Samuel Moore and Couplamatic could conspire together within the meaning of Section 1 of the Sherman Act. Despite that assumption, the evidence does not establish the existence of a conspiracy. It is true that beginning in 1970, the Schabens, through hard work, opened a new multistate market for synthetic hose in the farm aftermarket by converting former purchasers of wire braid rubber hydraulic hose to Synflex hose. It is also true that by mid-1975 they were no longer distributors for Samuel Moore. While the Court can understand the Schabens' frustration and disappointment when their profitable distributorships collapsed, the Court cannot share their conviction that the collapse was caused by a conspiracy between Samuel Moore and Couplamatic to drive them out of business or otherwise restrain free trade.

In the Court's opinion, the Schabens' loss of business resulted from a combination of many other factors. Their initial success was attributable to a good product, their own hard work and a lack of competition. Although they were well aware of Samuel Moore's suggested prices, they chose not to follow them and charged their customers higher prices. As other distributors and the Couplamatic wagon jobbers entered into the competitive stream offering better service and lower prices, their former customers understandably switched suppliers. The nationwide shortages of 1973 and 1974 exacerbated their problems. The Schabens lost interest because they had to reduce their profit margin to compete. Bernard Schaben's loss of business in Kansas can in no way be attributed to Couplamatic wagon jobbers because they never operated in Kansas. The number of distributors of synthetic hose increased along with the increase in wagon jobbers.

Rather than indicating a conspiracy to restrain trade, the facts show a healthy competitive atmosphere. "It is the very nature of competition that the vigorous, efficient firm will drive out less efficient firms. This is not proscribed by the antitrust laws. 'Antitrust legislation is con-

cerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise.'" *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 855 (9th Cir. 1977).

The Court has extensively discussed the integrated nature of Samuel Moore and Couplamatic, *supra*, and will not repeat that analysis here. Suffice it to say that nothing in the record has convinced the Court a conspiracy or other unlawful arrangement existed intended to drive the Schabens out of business. *See Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 80–84 (9th Cir. 1969); *Diehl & Sons, Inc. v. International Harvester Co., supra*, at 115–119; *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 801–03 (9th Cir. 1976). *But see Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 32–36 (3rd Cir. 1978), *cert. denied*, —— U.S. ——, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).

■ In any event, the activities herein, whether the result of a conspiracy or not, did not constitute an unreasonable restraint on trade, nor was there an unlawful termination in violation of either § 1 of the Sherman Act or § 2(a) of the Clayton Act. There was no credible evidence that Samuel Moore and Couplamatic attempted to divide the industrial and agricultural markets so as to drive out the competition [i. e., the Schabens] and establish Couplamatic exclusively in the "ag trade". Synflex did possess special expertise regarding industrial application which it tried to pass on to plaintiffs; it did not, however, seek to discourage the Schabens' farm trade at any time. The shortages testified to at trial plagued numerous distributors, not just the Schabens. Further, synthetic hose comprised only a fraction of the relevant hydraulic hose market, as will be discussed in greater detail *infra*. Samuel Moore controlled only roughly five per cent of the hydraulic hose market, receiving competition from Gates, Parker Hannafin, and Imperial-Eastman. Its proportion of the market share of synthetic hose has been de-creasing although its sales have continued to increase.

The Court further concludes that, in light of the circumstances, plaintiffs were terminated with adequate cause. Plaintiffs operated within an acknowledged credit limit from the outset of their relationship with Samuel Moore, long before Couplamatic entered the competitive scene. They were aware that they were under a two-fold duty to (1) stay within an understood credit limit, and (2) pay all outstanding balances within thirty days. The Schabens deliberately chose to breach their duty and thereby expose themselves to the risk of termination. They cannot now be heard to complain.

## III

### MONOPOLY

Finally, the Schabens contend that Samuel Moore either monopolized or attempted to monopolize the distribution of synthetic hose in Nebraska and Iowa. However, these contentions are unsupported by the facts and do not satisfy the essential requirements of § 2 of the Sherman Act.

■ Under that section,

[E]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

There are two distinct elements to a § 2 monopolization violation: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident". *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct.

1698, 16 L.Ed. 778 (1966); *see United States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *Acme Precision Products, Inc. v. American Alloys Corp.*, 484 F.2d 1237, 1240 (8th Cir. 1973). As a prerequisite to recovery, plaintiffs must properly delineate the relevant market, which is comprised of a product and a geographic market.

■ In determining the relevant product market, this Court must examine the cross-elasticity of demand for that product, *i. e.*, the functional interchangeability of other products with the synthetic hose. Such factors as price, quality, and consumer readiness and ability to accept reasonable alternatives must be considered. *United States v. duPont & Co., supra*, 351 U.S. at 394, 396–404, 76 S.Ct. 994; *United States v. Grinnell Corp., supra*, 384 U.S. at 571, 86 S.Ct. 1698; *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.*, 531 F.2d 910, 918–19 (8th Cir. 1976); *United States v. Empire Gas Corp.*, 393 F.Supp. 903, 909–10 (W.D.Mo.1975), *affirmed*, 537 F.2d 296 (8th Cir. 1976) (Court of Appeals, however, reaching a different conclusion regarding the relevant product market).

The inescapable conclusion in the instant case is that the relevant product market encompassed hydraulic hose—including rubber wire braid and synthetic hose—not just synthetic hose. Virtually every witness testified that the two types of hose were interchangeable for all practical purposes. The Synflex synthetic hose initially was somewhat cheaper, although it later rose in price. Both types of hose experienced some shortages throughout the relevant period. Thus, hydraulic hose consumers could readily use the rubber wire braid hose instead of synthetic hose and they must be considered to comprise the same market.

■ "The [relevant] geographic market encompasses the area in which the defendant effectively competes with other individuals or businesses for the distribution of the relevant product." *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc., supra*, at 918. It is not necessarily defined by the defendant's sales area, but, rather,

covers the territory "in which the seller competes for distribution of his product and to which the buyer can turn for alternative sources of supply." *United States v. Empire Gas Corp.*, 537 F.2d at 304.

■ The Schabens contend the relevant geographic market is limited to Iowa and Nebraska, the "heart" of their respective Synflex distributing businesses. However, the Court believes the more appropriate geographic market consists of the Schabens' entire distribution network, with the possible exception of Kansas where Synflex and Couplamatic both had distributors but the wagon jobber direct sales program was not in effect. Premised on these conclusions, there was no showing that defendant achieved a monopoly or even posed a dangerous probability of monopolization.

### Samuel Moore's Counterclaim

■ Defendant's original counterclaim, filed June 14, 1978, was brought pursuant to this Court's pendent jurisdiction and sought recovery of $4,614.94 on certain disputed invoices. The claim, which at the time of trial was still pending in Carroll County District Court, was amended by defendant at trial and limited to three invoices totalling $2,832.00 (rounded to the next highest dollar), based upon its decision to disregard all amounts due of less than $100, the determination that Paul Schaben was correct on two invoices, and the inability to locate three disputed invoices.

Paul Schaben testified regarding the first disputed invoice, Defendant's Exhibit 1101, that he was not given the appropriate quantity discount on the O-ring couplings he ordered. Regarding the remaining invoices for 3700 series Synflex hose, Defendant's Exhibits 1102 and 1103, Paul Schaben testified that he was overcharged due to Samuel Moore's failure to ship promptly. He contended that shipment was deliberately delayed in order to deprive him of a five per cent discount which was discontinued and to allow Samuel Moore to take advantage of a price increase.

Samuel Moore offered its distributors a quantity discount on orders for 5,000 or more O-ring couplings, provided they were placed in one order and were shipped in one shipment. [Plaintiffs' Exhibit 42, 49.] On January 8, 1974, Paul Schaben placed a blanket order for the entire year for 5,520 couplings. This blanket order further specified the number of couplings Paul Schaben desired to have shipped in a given month. [Plaintiffs' Exhibit 75.] Only 600 couplings were shipped in the initial shipment, thereby depriving plaintiff of the appropriate quantity discount. [Defendants' Exhibit 1101.] Since this procedure was in accord with Samuel Moore's announced one order/one shipment quantity discount policy, the Court must find in favor of defendant-counterclaimant Samuel Moore for $403.20, the amount disputed in Defendant's Exhibit 1101.

Paul Schaben was advised by letter dated December 28, 1973, that effective February 1, 1974, the five per cent quantity discount on 3700 series hose would be discontinued on all orders shipped after February 1, 1974, presumably regardless of the date ordered. Likewise, orders currently booked but shipped after February 1, 1974, would be subject to increased prices. [Plaintiffs' Exhibit 81.] The hose orders reflected in Defendant's Exhibits 1102 and 1103 were placed on January 31, 1974, and were shipped on March 8, 1974. There is no credible objective evidence to support Mr. Schaben's claim that the orders were deliberately withheld to his detriment. Paul Schaben was, therefore, not entitled to a discount and was subject as per the advance notice, to the aforementioned price increase. Thus, the Court again finds defendant entitled to recover the additional sums of $1,824.00 and $604.00 due on Defendant's Exhibits 1102 and 1103, respectively.

IT IS THEREFORE ORDERED that judgment shall be entered for the defendant Samuel Moore and against the plaintiffs Paul Schaben and Bernard Schaben.

IT IS FURTHER ORDERED that defendant-counterclaimant Samuel Moore shall recover the sum of $2,831.20 plus interest at the rate of five per cent per annum beginning six months from the date of the last item entered on its counterclaim against plaintiff Paul Schaben.

IT IS FURTHER ORDERED that defendant shall recover its costs from the plaintiffs.