**UNITED STATES of America, Plaintiff,**

v.

**ARCHER–DANIELS–MIDLAND COMPANY and Nabisco Brands, Inc., Defendants.**

**Civ. No. 83–51–D.**

United States District Court, S.D. Iowa, C.D.

Aug. 6, 1987.

See also 785 F.2d 206.

Michael D. McNeely, John W. Poole, Bruce K. Yamanaga, Sylvia M. Scott, Joseph Allen, U.S. Dept. of Justice, Antitrust Div., Lit. I Section, Washington, D.C., and Christopher D. Hagen, U.S. Atty., S.D. Iowa, Des Moines, Iowa, for the U.S.

Randolph Wilson, Theodore Voorhees, Washington, D.C., Lance A. Coppock, Des Moines, Iowa, and Burton H. Brody, Chief Lit. Counsel, Nabisco Brands, Inc., New York City, for Nabisco Brands, Inc.

Owen Johnson, David Donohoe, Paul Hewitt, Clinton Batterton, Paul Gerlach, Washington, D.C., L. Call Dickinson, Jr., Mark Schantz, Des Moines, Iowa, for Archer–Daniels–Midland Co.

## MEMORANDUM OPINION

VIETOR, Chief Judge.

This is an antitrust case brought by the United States of America ("Government") against the defendants, Archer–Daniels–Midland Company ("ADM") and Nabisco Brands, Inc. (Nabisco).

On June 12, 1982, Nabisco leased to ADM, for a specified number of years, two corn wet milling plants, one in Clinton, Iowa, and the other in Montezuma, New York. The Government alleges that the lease agreement is a contract or combination creating an unreasonable restraint of trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and that the lease also amounts to an acquisition which may substantially lessen competition in violation of section 7 of the Clayton Act, 15 U.S.C. § 18.[1]

■ An essential element of both of the alleged antitrust violations is proof of injury to competition in the relevant product market. Therefore, the relevant product market must be defined. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965). This memorandum opinion explains the following Rulings and Order of Dismissal deciding the relevant product market issue, entered on May 29, 1987:

All parties—the defendants through their motion for summary judgment and the plaintiff through its cross-motion for summary judgment—seek adjudication of a major issue in this antitrust case: whether the relevant product market is limited to high fructose corn syrup (HFCS). [Footnote omitted.]

The summary judgment record, to which I have applied the tests of interchangeability of use, cross-elasticity of demand and price correlation, shows that the relevant product market is not limited to HFCS; therefore, there is no genuine issue about relevant product market left to try. Because plaintiff's claims are dependent upon proving that the relevant product market consists solely of HFCS, defendants are entitled to judgment as a matter of law.

Plaintiff's cross-motion for summary judgment is denied. Defendants' motion for summary judgment is granted, and IT IS ORDERED that plaintiff's complaint be dismissed.

A memorandum opinion explaining this decision will be filed in the near future.

At the time of the hearing on the cross-motions for summary judgment, the parties had been allowed over four years of discovery, which was extensive. At the hearing on the motions for summary judgment, counsel for both sides agreed that the evidence now in the record on the relevant product market issue is much the same as it would be at trial and that the record is adequate for deciding the relevant product market issue on the cross summary judgment motions.[2] I agree.

I have relied on evidence submitted by the parties as undisputed, and this evidence consists in large part of information and data from the Government itself or from

---

**1.** Earlier in the litigation this court held that the lease constitutes an acquisition by ADM of part of the assets of Nabisco within the meaning of section 7 of the Clayton Act. *United States v. Archer–Daniels–Midland Co.*, 584 F.Supp. 1134 (S.D.Iowa 1984), certified interlocutory appeal under 28 U.S.C. § 1292(b) *dismissed*, (8th Cir. May 29, 1984) (unpublished order).

**2.** Tr., Hearing on Motions for Summary Judgment at 22, 43 (April 1, 1987). There have been numerous depositions of executives of both defendants and Government officials, as well as depositions of several third parties. Both sides also have made extensive use of interrogatories, requests for documents and requests for admissions. In addition, pursuant to pretrial scheduling orders, each party has served a statement of factual contentions, provided statements of the expected testimony of expert witnesses in accordance with Fed.R.Civ.P. 26(b)(4)(A)(i), and exchanged lists of all persons expected to be called as witnesses at the trial, which was scheduled to commence in September 1987. The record before the court also includes stipulated market share data.

third parties: (1) documents prepared with the official sanction and approval of various agencies of the Government; (2) the affidavits and deposition testimony of present or former Government employees, including those who were responsible for the Government documents referred to above; (3) admissions and answers to interrogatories given by the Government in this litigation, as well as market share stipulations; and (4) depositions and affidavits of third parties based on personal knowledge, including independent sweetener distributors and brokers as well as food and beverage processors.

The evidentiary facts now available in the record are unusually extensive, particularly in regard to basic economic data. For example, the parties entered into a 26–page stipulation of detailed market share information with a breakdown reflecting four different approaches to the scope of the relevant market. The record also includes numerous reports and publications containing economic data and analyses prepared by personnel concerned with sweeteners in the United States Department of Agriculture (USDA), such as economists in the Economic Research Service of USDA.

For years, the Government has monitored and regulated sweeteners through a far-reaching and complex set of regulations generally called the "U.S. Sugar Program," which has been implemented in large part by USDA. As a result of the U.S. Sugar Program, the USDA as well as other agencies of the Government have issued numerous publications containing economic data

and analyses. One of the more informative publications is entitled "Sugar and Sweetener Outlook and Situation Report," which is now published by USDA in March and September of each year and is supplemented annually by another report entitled "Sugar and Sweetener Outlook and Situation Yearbook." These documents and related deposition testimony are admissible as party-opponent admissions under Fed.R. Evid. 801(d)(2)(D). *United States v. American Tel. & Tel. Co.*, 498 F.Supp. 353, 356–58 (D.D.C.1980).[3]

### SWEETENERS AND THEIR MARKETING

A publication of the USDA identifies the sweetener market in the United States as follows:

> The sweetener market consists of caloric and non-caloric sweeteners. Caloric sweeteners include beet sugar, cane sugar, corn sirup [glucose], dextrose, new high fructose corn sirup [HFCS], honey, edible molasses, maple sirup, sugarcane sirup and sorghum sirup. The non-caloric sweeteners consist of saccharin ... and aspartame.[4]

The great bulk of caloric or nutritive sweeteners consists of cane sugar, beet sugar and corn sweeteners (glucose, dextrose and HFCS). Non-caloric or non-nutritive sweeteners, sometimes called "artificial" or "diet" sweeteners, have little or no caloric value and consist primarily of saccharin and aspartame.[5] The court's conclusion that the relevant market is not limited to

---

3. Both parties have relied on these USDA reports. *E.g.*, Defendants' Deposition Exhibit 2 ("DDX 2"); DDX 3–15. Excerpts are included in defendants' Attachments ("Def. Att.") and Supplemental Attachments ("Def. Supp. Att.") submitted with defendants' motion for summary judgment. The Government has also relied on the USDA's Sugar and Sweetener Outlook and Situation Report. Its cross-motion for summary judgment is accompanied by a volume of 58 documents consisting of affidavits and other documents included in the record as Government Deposition Exhibit ("GDX") or "Attachments" ("Pl. Att."). Attachment 54, for example, is a graph (reproduced later in this memorandum opinion) based on data published in USDA's Sugar and Sweetener Outlook and Situation Report. Referring to this type of report, an

economist from USDA testified that it has "the official sanction and approval of the USDA prior to publication." Barry Dep. at 105.

4. Bohall, et al., The Sugar Industry's Structure, Pricing and Performance, Economic Research Service, USDA Economic Report No. 363, at 1 (March 1977). The complete report is in the record as DDX 63, and excerpts were included in Def. Att. 40. This document is a comprehensive report, 114 pages in length, and includes numerous statistical tables and graphs.

5. In 1970, the use of cyclamates in the United States was banned by the Federal Food & Drug Administration because of health concerns. DDX 31 at 551; Def. Att. 13.

HFCS because it includes sucrose made from sugarcane and sugarbeets makes it unnecessary to decide whether the relevant product market is broad enough to include any other sweeteners, such as aspartame or saccharin.

### Production of Sweeteners

(1) *Cane sugar.* This type of sweetener is produced from sugarcane, a tall perennial grass grown in tropical and semi-tropical climates. Two to four crops (ratoon crops) are harvested from the original planting in the absence of frost or disease, and each crop matures in 12 to 24 months.

Sugarcane must be processed into raw sugar within hours after the cane is cut in order to maximize juice extraction and avoid a chemical breakdown of the sucrose. Such processing occurs at "sugar mills" that are located on or near sugarcane plantations. In these mills, the juice from the cane stalk is extracted, clarified, boiled and crystalized into "raw sugar," a world-wide commodity that is processed into refined cane sugar at cane refineries. Traditionally, about 70% of the refined sugar consumed in the mainland of the United States is provided by cane refineries, and historically a substantial portion of such refined cane sugar (approximately 50% in 1982) has been produced from imported raw sugar.[6]

(2) *Beet sugar.* This type of sweetener, like cane sugar, is a form of sucrose. However, it is derived from sugar beets, a cool weather agricultural product that can be grown in the colder climates of Minnesota, Montana, North Dakota and Idaho as well as the warmer climates of California, southwestern Kansas, southern Colorado and parts of Texas. The growing season allows plantings in the early spring and harvesting in the fall.

Unlike sugarcane, beets cannot be converted into raw sugar which can be shipped great distances and stored for an extensive period of time before refining. Instead, the processing of beets into refined sugar is accomplished in one continuous process at a beet refinery.[7]

(3) *Corn sweeteners.* A variety of sweeteners can be produced from corn. The United States is the world's leading producer of corn, and No. 2 Yellow Corn (grown in the corn belt states, including Iowa, Nebraska, Illinois and Indiana) is especially useful in the production of sweeteners. Unlike cane and beets, corn can be stored for a substantial period of time without serious deterioration. This allows the processing of corn sweeteners on a year-round basis.

Corn sweeteners are produced in corn wet milling plants which typically make three types of corn-derived sweeteners: (1) glucose (sometimes called regular corn syrup); (2) dextrose (sometimes called corn sugar); and (3) HFCS. These plants also produce other corn-derived products, such as corn starch, starch-derived dextrin, and several other "byproducts" such as corn oil, corn gluten meal, corn gluten feed and steep water concentrate.

It was not until the early 1970's that new technology was in widespread commercial use to process glucose or dextrose syrup into a sweeter product by the use of enzymes capable of isomerizing syrup into fructose. This isomerization process is used today, either directly or by blending, to produce corn syrup containing 42% fructose ("HFCS–42"), 55% fructose ("HFCS–55"), and 90% fructose ("HFCS–90"). Although HFCS 42 is not as sweet as sugar, it may be used as a substitute or partial substitute for sugar in sweetening various products, such as canned fruits and vegetables. HFCS–55, the most popular corn sweetener used by soft drink bottlers (such as Coca Cola), is approximately 94% to 95% as sweet as sucrose.[8]

---

6. Sugar: Background for 1985 Farm Legislation, USDA Bull. 478, at 2–12 (Sept. 1984) (DDX 3, Def. Att. 21).

7. *Ibid.*

8. This summary of the production of corn sweeteners is based largely on a memorandum on corn wet milling prepared in the Department of Justice, November 29, 1979. Def. Att. 8. *See also* Def. Supp. Att. 14, at ¶ 8 on the sweetness of NFCS–55 as compared to sugar.

## Distribution of Sweeteners

In the distribution of sweeteners to large processing companies, such as the major soft drink bottlers or other substantial food processing companies, the selling function is usually performed directly by sales personnel employed by a sweetener manufacturer to call on those accounts. For small to medium-sized sweetener users, of which there are many in the United States, the selling function is often performed by a group of specialized vendors. These are independent companies known as sweetener distributors or brokers. A sweetener distributor purchases outright all types of nutritive sweeteners, such as sugar, glucose and HFCS, and thereafter resells those products to users. A broker covers the same range of sweeteners, but serves as a selling agent or representative of several sweetener manufacturers and sells at prices and terms set by each supplier.[9]

Brokers and distributors may operate "blending" facilities, which can be used to convert dry sugar into liquid form and then blend it with one or more varieties of corn sweeteners, such as regular corn syrup, HFCS-42, or HFCS-55.[10] Blends of sweeteners are often used by fruit and vegetable canners, and where the canning plant does not have its own blending equipment, the independent distributor or broker with blending facilities is able to supply a sweetener blend containing the particular combinations of various types of sweeteners desired by the canner.[11]

## U.S. Sugar Program

The United States has always been an importer of sugar, and hence the Government has been involved in the sugar trade for many years. This involvement began in 1789 with the imposition of a tariff on raw sugar to help raise revenue, and it continued as a revenue-raising device until 1934.

In 1934 growers of sugarcane and sugarbeets in the United States were suffering from severe economic distress, and Congress enacted The Sugar Act of 1934 to provide them with protection from low-priced imported sugar. This was the beginning of the "U.S. Sugar Program," which in 1934 included both direct subsidy payments to growers and a processing tax on refined sugar. With various amendments, the basic form of the U.S. Sugar Program developed in 1934 remained in effect through December 1, 1974. At that time, Congress allowed the U.S. Sugar Program to expire and failed to enact any new legislation to pay subsidies to domestic growers of cane or beets.

After a precipitous decline in sugar prices in 1976, Congress enacted the Food and Agriculture Act of 1977. This legislation provided price supports for both sugarcane and sugarbeets, which were to be implemented through government loans or purchases at prices equal to specified percentages of the "parity" price. However, the program provided by this legislation did not go into effect immediately, and market prices for sugar were adequate to sustain the 1980 and 1981 crops of domestic growers at or above the parity price. Hence, no price support program for sugar was in effect for those years.

The next U.S. Sugar Program was created by the Food and Agriculture Act of

9. For example, the record shows that Liquid Sugars, Inc., based in Emeryville, California, is a sweetener distributor. *See* Saroni Affidavit, Pl. Att. 13 at 1. Pierson–Pelzman, Inc. in Waukesha, Wisconsin, serves as a broker or selling agent for as many as eight different sweetener manufacturers that product beet and cane sugar, as well as various corn sweeteners. This brokerage company operates primarily in the state of Wisconsin and sells sweeteners to over 100 different accounts. *See* Pelzman Dep. at 5–6, 9, 18.

10. Pelzman Dep. at 7–8. *See also* DDX 11 at 13; Def. Att. 11.

11. For example, Mr. Clifford Nagle, Vice President—Purchasing of Tri–Valley Growers, Inc., testified at his deposition that Tri–Valley Growers has used various blends of sweeteners for its canned fruits and vegetables. Since 1981, Tri–Valley has used a blend consisting of 10% sugar, 40% canners' grade regular corn syrup, and 50% HFCS. Tri–Valley produces canned peaches at three or four different plants, some of which have blending capability whereas others do not. Those not having such facilities must purchase a pre-blended sweetener containing the required proportions of the various sweeteners in the formula. Nagle Dep. at 19, 38.

1981. It provided for a non-recourse "loan program" implemented by the USDA in establishing a "loan rate" for raw cane sugar (with a parity formula for beet sugar), coupled with a "market stabilization price" and the imposition of flexible duties, import fees and specific quotas on raw sugar imported into this country. Under this program, the federal government has often imposed duties and import fees at maximum levels, and has established import quotas at low levels for the purpose of restricting the supply of imported sugar and thereby driving up the price of domestic sugar to an artificially high level at or above the "loan rate." This program remained in effect through 1985, and essentially the same form of program was continued when Congress enacted the 1985 Farm Act, which will automatically expire by its own terms in 1990.[12]

The future of the current U.S. Sugar Program is uncertain. On December 15, 1986, the USDA announced that the current Administration will seek new legislation in 1987 to terminate the existing Sugar Program before the scheduled expiration in 1990 and to make "fundamental changes" for the future. The details of the Administration's proposal to reform the Sugar Program and the underlying need for change were explained later in the 1987 Report of the President's Council of Economic Advisors (CEA):

> The 1985 [Farm] Act has continued to impose waste and economic losses on the American economy ... especially sugar and dairy. Over much of the 1980's, taxpayer costs of [such] government programs ... have been at record levels.[13]

The CEA also criticized the U.S. Sugar Program for its devastating economic effects on America's friendly trading partners in Latin America and the Philippines, whose economies have suffered losses in the billions. For these reasons:

> The Administration also proposes changes in the U.S. Sugar Program to deal with distortions generated by current policy. The proposed reform would lower the price-support loan rate [from 18 cents] to 12 cents a pound while providing transition payments to cane and beet producers over a four year period. Prices paid by domestic sugar consumers will fall as a result. By modifying the incentives that distort domestic production and consumption, U.S. sugar policy moves slowly toward a more market-oriented position.[14]

The changes now being pursued by the Administration would cause domestic sugar prices to move much closer to the lower world sugar prices.

There is also uncertainty concerning the form that the U.S. Sugar Program might take in the future, if there is one. An official notice placed by the Secretary of Agriculture in the Federal Register at a time when no sugar program was in effect and when various options were being considered, identified three different approaches: direct subsidy payments to farmers with only limited control of domestic market prices; a "non-recourse loan program" of the type currently in effect with tight controls to inflate domestic prices in order to avoid losses by the government on loans in default; and no program, at all.[15] The various approaches would have differing effects on the dynamics of the sweetener market and the domestic price of sugar.

The parties to this litigation agree that the current U.S. Sugar Program has artificially inflated the price of sugar, and as a result, the domestic price of sugar has been higher than the price of HFCS.[16] The un-

---

12. The history of the U.S. Sugar Program is outlined in Sugar: Background for 1985 Farm Legislation, USDA Vull. 478, at 32–38 (Sept. 1984) (DDX 3; Def. Att. 21).

13. Def. Supp. Att. 12, Ex. C at 155 (Jan. 1987).

14. *Id.*

15. *See* Bohall, Memorandum for the Secretary of Agriculture, at 8–9 (April 2, 1981) (DDX 40; Def. Att. 43).

16. *See* Plaintiff's Statement of Material Facts As to Which There Is No Genuine Issue to Be Tried, ¶ 10: "The price of sucrose has generally been and will remain significantly higher than the price of HFCS as a result of the government's Sugar Program...." *See also* Defend-

disputed evidence shows that both before and after the lease agreement of June 1982, HFCS prices have generally reflected a discount of 10 to 30% off the price of sucrose (cane sugar and beet sugar).[17]

## POSITIONS OF PARTIES ON RELEVANT PRODUCT MARKET

Defendants assert that, at the very least, the relevant product market includes sugar derived from cane and beets as well as HFCS, and may encompass all sweeteners including aspartame and saccharin. The Government contends that one type of corn sweetener—high fructose corn syrup (HFCS)—stands alone in a separate market. Thus, the Government's position is that the relevant product market *excludes* cane sugar, beet sugar, glucose and dextrose, as well as all diet sweeteners.

There is no dispute that if the relevant market includes either cane sugar or beet sugar, then both types of sugar must be included. Similarly, neither party contends that the relevant market, whether it consists of HFCS alone or other sweeteners as well, should be fragmented into separate sweetener markets or submarkets for each major category of food or beverages using sweeteners. This is consistent with the evidence showing that sugar (cane and beet) and corn sweeteners are used, in varying degrees, in all major categories of foods and beverages, as illustrated by the following schedule:

Percent of Total Caloric *Sweetener Use*[18]

| Category of Use | In 1982 | | Long–Term Theoretical Penetration | |
| --- | --- | --- | --- | --- |
| | HFCS | Sugar and All Other Caloric | HFCS | Sugar and All Other Caloric |
| Beverages | 36 | 64 | 90 | 10 |
| Baking | 24 | 76 | 26 | 74 |
| Canning | 61 | 39 | 70–75 | 25–30 |
| Processed Foods | 48 | 52 | 60–66 | 34–40 |
| Dairy Products | 31 | 69 | 36 | 64 |
| Confections | 1 | 99 | 5 | 95 |

The record before the court includes stipulated market-share data relating to four possible relevant product markets: (1) HFCS alone (as alleged by the Government); (2) HFCS plus sucrose; (3) all nutritive sweeteners; and (4) all sweeteners. Although such data are not directly pertinent to delineating the relevant market, they do serve to underscore that the parties are here seeking adjudication of a major and dispositive issue in this antitrust case. As noted on page 1 of this memorandum opinion, an essential element of both of the alleged antitrust violations is proof

ants' Statement of Material Facts As to Which There Is No Genuine Dispute, at ¶ 10: "Plaintiff [Government] currently imposes a regulatory system (the 'U.S. Sugar Program') that effectively raises domestic sugar prices substantially above world market levels."

**17.** A USDA memorandum in 1981, a year prior to the lease, noted that "HFCS is a low cost sweetener which is competitive with sugar ... and is priced 15 to 30 percent less than sugar." (DDX 79 at 2; Def. Att. 42). *See also* Proctor Aff. ¶ 4, Pl. Att.

**18.** Source: National Food Review, USDA Economic Research Service at 10 (Aug. 1983) (DDX 34; Def. Att. 11). The data in the record from which this schedule is derived shows separately the percent of use of HFCS in each of the indicated categories of foods and beverages, and the data shown for "sugar and all other caloric" sweeteners are derived by subtracting from 100% the applicable percent for HFCS alone. This category for "sugar and all other calorie" includes not only sugar, but also two types of caloric corn sweeteners (glucose and dextrose). Since glucose and dextrose are used in significant quantities in canning, dairy products, and confections, the percentage of use of *all* corn sweeteners (HFCS, glucose and dextrose) would be greater than those shown in the schedule above for HFCS alone.

of injury to competition in the relevant market.

The Department of Justice has issued Merger Guidelines which endorse the Herfindahl–Hirschman Index ("HHI") test for determining whether a proposed merger will produce the requisite injury to competition. Under these Guidelines, as amended in 1984, any relevant market in which the post-merger HHI is below 1,000 points is considered to be "unconcentrated," and a merger in such a market will therefore not be challenged by the Department of Justice except in extraordinary circumstances. *See* DOJ 1984 Merger Guidelines § 3.11(a),

*reprinted in* 2 Trade Reg.Rep. (CCH) ¶ 4493.101(a). Even in relevant markets having a post-merger HHI between 1,000 and 1,800 points, the Department is not likely to challenge a merger that causes an increase in HHI of less than 100 points in such a market. *Id.* at ¶ 4493.101(b). Accordingly, any merger that has a post-merger HHI of less than 1,000 points, and does not increase the HHI by 100 points, is well within a "safe harbor" of legality.

The market share stipulations of the parties (Def. Att. 54) include the following data:

| | All Sweeteners | All Nutritive Sweeteners (Sucrose + All Corn Sweeteners) | Sucrose + HFCS Only | HFCS Only |
|---|---|---|---|---|
| 1983 post-lease HHI | 634 | 706 | 741 | 2071 |
| 1981 pre-lease HHI | 601 | 641 | 742 | 1737 |
| HHI change 1981 to 1983 | + 33 | + 65 | − 1 | + 334 |

Thus, in any relevant market that includes both HFCS and sucrose, the lease is in a "safe harbor" because the *maximum* HHI after the lease is far below 1,000 points (634 to 741) and the *maximum increase* in the HHI after the lease is only 65 points. Indeed, in a relevant market consisting of only HFCS and sucrose, the post-lease HHI is actually *lower* than that which prevailed prior to the lease. Except for the alleged market limited to HFCS alone, the stipulated data on market concentration are inconsistent with antitrust injury to competition attributable to the ADM/Nabisco lease.[19]

**19.** Government counsel, Mr. McNeely, recognized this at oral argument:

> THE COURT: You do agree that if I agreed with defendants as to the relevant product market, that ends the lawsuit.
> MR. McNEELEY: Yes.

Tr. at 46 (April 1, 1987).

**20.** Illustrative examples of such issues are: (1) whether expulsion from a cooperative buying group is a *per se* illegal boycott, *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 105 S.Ct. 2613, 86

## STANDARDS FOR GRANTING SUMMARY JUDGMENT

Part (c) of Fed.R.Civ.P. 56, the summary judgment rule, provides in part: "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

■ In recent years numerous types of antitrust issues have been decided on summary judgment.[20] Here, the parties seek

L.Ed.2d 202 (1985); (2) whether the alleged misconduct is protected by antitrust immunity as "state action," *Commuter Transportation Systems, Inc. v. Hillsborough County Aviation Authority*, 801 F.2d 1286 (11th Cir.1986); *Coastal Neuro–Psychiatric Associates v. Onslow Memorial Hospital, Inc.*, 795 F.2d 340 (4th Cir.1986); (3) whether the plaintiff has "standing" to bring an antitrust treble damage case, *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445 (9th Cir.), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985); *Province v. Cleveland Press Pub. Co.*, 787 F.2d 1047 (6th Cir.1986); (4) whether evidence

summary judgment on the relevant product market, and this, too, is an issue that can appropriately be decided on summary judgment.[21]

Two 1986 decisions of the Supreme Court have reinforced the utility of summary judgment in complex litigation after the parties have had ample time for discovery. In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court held that Fed.R.Civ.P. 56 does not require the moving party to negate every argument in the opponent's claim because

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Id.* 106 S.Ct. at 2552–53. The Court reasoned that whenever an essential element in the opposing party's case is missing, this "necessarily renders all other facts immaterial." *Id.* at 2553. Thus, if there is undisputed evidence that is sufficient as a matter of law to negate an essential element in the opposing party's case, it becomes legally irrelevant that there is some disputed evidence either on that element or on any other material fact. *Id.*

The *Celotex* approach to summary judgment is applicable to antitrust cases. The Court applied the same principles in *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), an antitrust case in which the key issue was whether a

group of Japanese manufacturers had entered into an antitrust conspiracy to fix unreasonably low prices on electronic products sold in the United States. The Third Circuit had overturned the district court's granting of summary judgment on the ground that the alleged conspiracy was an issue of fact which it believed should have been resolved by the jury, as the underlying evidentiary facts tended to support inferences in both directions. The Supreme Court reversed, holding that because part of the underlying evidentiary facts not in dispute showed that defendants' conduct was just as consistent with lawful independent action as it was with an alleged unlawful antitrust conspiracy, the record was insufficient as a matter of law to support an inference of conspiracy, the ultimate fact issue in the case. 106 S.Ct. at 1357.[22]

In this case the court is satisfied, based on a review of the summary judgment record and the above cases, that the issue of the relevant product market can and should be resolved on the summary judgment record.

## THE RELEVANT PRODUCT MARKET

The alleged anticompetitive effects of the lease challenged by the Government in this lawsuit must be evaluated in a "relevant market" that has both product and geographic dimensions. As the Supreme Court has observed:

> Without a definition of that market, there is no way to measure [the] ... ability [of the challenged transaction] to lessen or destroy competition.

---

in the record on summary judgment fails to show the requisite injury to competition, *Mid-South Grizzlies v. National Football League*, 720 F.2d 772 (3d Cir.1983); (5) whether the evidence establishes an exclusive dealing arrangement, *Famous Brands, Inc. v. David Sherman Corp.*, 814 F.2d 517, 524 (8th Cir.1987).

**21.** *Thurman Industries, Inc. v. Pay'N Pak Stores, Inc.*, 1987–1 Trade Cas. (CCH) ¶ 67,591 at pp. 60,544–46 (W.D.Wash. May 27, 1987); *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 493–95 (4th Cir.1986); *Jayco Systems, Inc. v. Savin Business Machines Corp.*, 777 F.2d 306, 318–20 (5th Cir.1985), *cert. denied*, 479 U.S. 816, 107 S.Ct.

73, 93 L.Ed.2d 30 (1986); *Ralph C. Wilson Industries, Inc. v. American Broadcasting Co.*, 598 F.Supp. 694 (N.D.Cal.1984), *aff'd*, 794 F.2d 1359 (9th Cir.1986); *In re Municipal Bond Reporting Antitrust Litigation*, 672 F.2d 436 (5th Cir.1982). *See also The Supreme Court, 1985 Term: Summary Judgment*, 100 Harv.L.Rev. 100, 250–58 (1986).

**22.** A similar analysis was used by this court to reach the same conclusion in *Impro Products, Inc. v. Herrick*, 1982–2 Trade Cas. (CCH) ¶ 64,906 (S.D.Iowa 1982), *aff'd*, 715 F.2d 1267 (8th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984).

*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., supra,* 382 U.S. at 177, 86 S.Ct. at 350. In this case, the parties agree that the geographic scope of the relevant market is nationwide. Accordingly, the only issue before the court concerns the product or products included in that market.

*Principal Legal Tests for Defining the Relevant Product Market: Interchangeability of Use, Cross–Elasticity of Demand, and Price Correlation*

In deciding the issue of the relevant product market in this case, this court has applied the tests of interchangeability of use, cross-elasticity of demand, and price correlation. These are the principal tests that have been adopted by the Supreme Court, *e.g., Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–1524, 8 L.Ed.2d 510 (1962); *United States v. E.I. Du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) ("*Cellophane* case"); *United States v. Continental Can Co.,* 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); by the Eighth Circuit, *United States v. Empire Gas Corp.,* 537 F.2d 296, 303–04 (8th Cir. 1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1987); *General Industries Corp. v. Hartz Mountain Corp.,* 810 F.2d 795 (8th Cir.1987); by other courts of appeals, *American Crystal Sugar Co. v. Cuban–American Sugar Co.,* 259 F.2d 524 (2d Cir.1958); *SmithKline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056 (3d Cir.), *cert. denied,* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed. 2d 134 (1978); and also by this court, *Schaben v. Samuel Moore & Co.,* 462 F.Supp. 1321, 1334 (S.D.Iowa 1978), *aff'd,* 606 F.2d 831 (8th Cir.1979).

■ The court's conclusions on the relevant product market, as set forth below, rest upon the combined effect of its findings under all of these tests, and not just on one test alone. As the Eighth Circuit has noted, "functional interchangeability" of two or more products is "germane to the inquiry" on the relevant product market, but "the inquiry does not end there." *Empire Gas,* 537 F.2d at 303. Rather, the inclusion of a product in the relevant mar-

ket along with other substitutes also "depends on the cross-elasticity of demand for that product," which focuses on the "ability of consumers to turn to reasonable alternatives to the product in question." *Id.*

The closely related tests of interchangeability and cross-elasticity were established in the *Cellophane* case, where the government argued for a relevant market limited to cellophane and for the exclusion of all other flexible wrapping materials that were substitutes for cellophane. In rejecting a market limited to cellophane, the Court observed that, under the government's theory, "only physically identical products would be part of the market," whereas "[w]hat is called for is an appraisal of the 'cross-elasticity' of demand in the trade." *Cellophane,* 351 U.S. at 394, 76 S.Ct. at 1006–1007.

■ Evidence of cross-elasticity consists of changes in sales volume of two substitutes in response to changes in relative prices. If there is a price decrease in one of two substitutes, which results in a decrease of sales in the other product whose price does not change, this shows cross-elasticity. Similarly, cross-elasticity between two products is evidenced by an increase in the sales volume of one of the products as a result of an increase in the price of the other. *SmithKline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056, 1063 (3d Cir.), *cert. denied,* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978); *United States v. Empire Gas Corp.,* 537 F.2d 296, 306 (8th Cir.1976).

The test of price correlation or price sensitivity is closely related to cross-elasticity of demand. This correlation test focuses on whether prices of two substitute products tend to move together over time so that any price differential between them tends to be much the same on a percentage basis. This principle was applied in *American Crystal Sugar Co. v. Cuban–American Sugar Co.,* 259 F.2d 524 (2d Cir.1958). There, the Second Circuit rejected the contention that a price differential between cane sugar and beet sugar placed the two products in separate sweetener markets be-

cause "[s]ensitivity to price change, not price differential, is usually regarded as a proper element to measure cross-elasticity of demand" which places two interchangeable products in the same relevant market. *Id.* at 530.

The *Cellophane* decision also teaches that, in defining a relevant market where the evidence shows that several substitute products can fulfill the same function, it is useful to consider whether a particular product (cellophane) has fulfilled such function across a broad range of end uses. In *Cellophane*, the Court noted that "cellophane furnishes less than 7% of wrappings for baking products, 25% for candy, 32% for snacks [etc.] ... [s]eventy-five to eighty percent of cigarettes," and it was further noted that "overall ... cellophane accounts for 17.9% of flexible wrapping materials, measured by the wrapping surface." 351 U.S. at 399, 76 S.Ct. at 1009. The comparable data in this case are set forth earlier in this opinion, *supra*, pp. 1006–1007, and show that HFCS and sugar fit this same pattern by sharing sweetener usage to varying degrees across a broad range of food and beverage products.

Other leading cases show that consumer tastes and preferences are relevant in considering the quality aspects of interchangeable products selling at different prices for use in a finished product. For this reason, it is not decisive that some users decide to produce a finished product having particular characteristics that can best be provided by a higher-priced raw material as compared to lower-priced materials, because "price is only one factor in a user's choice" in selecting such a material. *United States v. Continental Can Co.*, 378 U.S. 441, 455, 84 S.Ct. 1738, 1746, 12 L.Ed.2d 953 (1964). In *Continental Can*, the evidence showed a substantial price difference between glass containers and metal cans, but the Court held that an "equally impor-

tant" consideration was consumer preference:

> The consumer, for example, may begin to prefer one type of container over the other and the manufacturer of baby food [metal] cans may therefore find that his problem is the housewife rather than the packer or the price of his cans.

*Id.* at 455–56, 84 S.Ct. at 1746–1747. The Court then observed that "[t]his may not be price competition but it is nevertheless meaningful competition between interchangeable containers." *Id.* at 456, 84 S.Ct. at 1746–1747.

Although evidence defining the market varies from case to case, the legal "tests are constant," and each relevant "market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *Cellophane*, 351 U.S. at 404, 76 S.Ct. at 1012.

### Legal Tests to Determine Whether There Is an Economically Significant Submarket

In *Brown Shoe, supra*, the Court reaffirmed that the principal tests of product market definition are "reasonable interchangeability of use or the cross-elasticity of demand" of substitutable products. 370 U.S. at 325, 82 S.Ct. at 1523–1524. The Court also identified certain other tests that could be considered to determine if there is an "economically significant submarket." *Id.*[23] As applied to the summary judgment record in this case on the relationship between sugar and HFCS, these would include such tests as "distinct customers, distinct prices ... and specialized vendors." *Id.* Because the Government's cross-motion relies so heavily on "distinct prices," the court has given special consideration to the precedents on that test.

At the outset, it is significant that the relevant market in *Cellophane* included all

**23.** As the Ninth Circuit has noted, the question "[w]hether or not a court is justified in carving out a submarket depends ultimately on whether the factors which distinguish one purported submarket from another are 'economically significant' in terms of the alleged anticompetitive effect." *International Tel. & Tel. Corp. v. General Tel. & Electronics Corp.*, 518 F.2d 913, 932 (9th Cir.1975); *M.A.P. Oil Co. v. Texaco, Inc.*, 691 F.2d 1303, 1307 (9th Cir.1982). For this reason, the "standard market tests," such as product interchangeability and cross-elasticity, may not be "abandoned or ignored and replaced with a less demanding 'submarket test'." *White & White, Inc. v. American Hospital Supply Corp.*, 723 F.2d 495, 502 (6th Cir.1983).

flexible wrapping materials even though such materials had a very wide range of price differentials. The Court upheld this definition of the market knowing that the undisputed evidence showed that du Pont's price for cellophane was "two or three times as much, surface measure, as its chief competitors" selling other wrapping materials. 351 U.S. at 401, 76 S.Ct. at 1010. As explained by the Court:

> The selling price between commodities with similar uses and different characteristics may vary, so that the cheaper product can drive out the more expensive.... Cellophane costs more than many competing products and less than a few. But whatever the price, there are various flexible wrapping materials that are bought by manufacturers for packaging their goods in their own plants or are sold to converters who shape and print them for use in the packaging of the commodities to be wrapped.[24]

The Eighth Circuit has subscribed to the *Cellophane* approach to the legal significance of a price differential in defining the relevant market. In *Acme Precision Products, Inc. v. American Alloys Corp.*, 484 F.2d 1237 (8th Cir.1973), it was argued that high-strength aluminum alloy was in a relevant market separate from other alloys because it had unique metallurgical characteristics, was protected by a patent, and sold at a consistently higher price. The court held that all of these differences, including the price differential, were not enough to create a separate market:

> Defendant urges that Almag 35 and Amalloy are the "cream" of the market as shown by plaintiffs' patent and plaintiffs' own advertising. But this argument is not convincing in view of the overall record of competitive interchangeability of all alloys marketed.

*Id.* at 1244.

The same approach was taken by Judge Stuart of this court in *Schaben v. Samuel*

*Moore & Co.*, 462 F.Supp. 1321 (S.D.Iowa 1978). There, citing *Cellophane*, Judge Stuart reached the "inescapable conclusion ... that the relevant product market encompassed hydraulic hose—including rubber wire braid and synthetic hose—not just synthetic hose." *Id.* at 1334. This conclusion was compelled because "the two types of hose were interchangeable for all practical purposes," and it was immaterial that "synthetic hose initially was somewhat cheaper, although it later rose in price." *Id.*

Similarly, in *Kaplan v. Burroughs Corp.*, 611 F.2d 286 (9th Cir.1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980), the Ninth Circuit affirmed the district court's judgment n.o.v. for defendant because plaintiff had failed to present sufficient probative evidence in support of the alleged relevant market. Plaintiff's theory of the relevant market was based upon an alleged price differential between certain types of computer equipment, and while the court agreed that a "price differential between competing products and services is a relevant factor to consider," the court rejected plaintiff's position because a "price differential alone does not govern the scope of the relevant market." *Id.* at 292.

In line with the *Cellophane* rule, several other courts of appeals have joined the Eighth Circuit in holding that interchangeable products with cross-elasticity of demand are in the same product market despite persistent patterns of differential pricing. *See, e.g., Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 840–41 (2d Cir.1980) (brand name and private label waffles); *Liggett & Myers, Inc. v. FTC*, 567 F.2d 1273, 1274–75 (4th Cir.1977) ("premium" and "economy" canned dog food); *George R. Whitten Jr., Inc. v. Paddock Pool Builders, Inc.*, 508

---

**24.** *Id.* at 396, 76 S.Ct. at 1008. Indeed, Appendix C of the Court's opinion in *Cellophane* showed that the price for Saran (one of the flexible packaging materials included in the relevant market) was 6.1¢ per 1,000 square inch, whereas plain waxed sulphite # 25 coated opaque (also in

the relevant market) was only 0.7¢ per 1,000 square inches. Thus, the price of Saran was 771% greater than the price of the other product in the same relevant market. 351 U.S. at 412, 76 S.Ct. at 1016.

F.2d 547, 553–54 (1st Cir.1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975) (conventional and "pipeless" recirculation systems for pools); *Bendix Corp. v. Balax, Inc.*, 471 F.2d 149, 161–62 (7th Cir.1972); *cert. denied*, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973) (swaging taps and cutting taps).

Cases relied on by plaintiff are distinguishable. For example, the Government places great reliance on footnote 31 in *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 612 n. 31, 73 S.Ct. 872, 882 n. 31, 97 L.Ed. 1277 (1953), which referred to hypothetical "variations in price" that might result in a "limited number of buyers" of a substitute product. The Court's decision in *Times–Picayune* preceded *Cellophane* and involved an alleged tie-in, rather than a merger. More importantly, footnote 31 was appended to the Court's discussion in the text emphasizing that the evidentiary record in *Times–Picayune* "contains no evidence which could circumscribe a broader or narrower 'market' defined by" other factors. *Id.*[25] The record in this case is quite different, since it includes undisputed evidence on interchangeability, cross-elasticity and price correlation.

The Government also cites *United States v. Aluminum Company of America*, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964) ("*Rome Cable* case"). There, the Court reached its decision on the relevant product market after expressly finding that, as to the two products in question, "prices do not respond to one another." *Id.* at 276, 84 S.Ct. at 1287. Here, the evidence establishes that the prices of HFCS and sugar are highly correlated, with HFCS prices following sugar prices.

*Plaintiff Has Burden of Proof*

[6] The plaintiff has the burden of proof on the relevant market. As the Eighth Circuit has stated:

As a prerequisite to recovery [on an antitrust claim] ... plaintiffs must properly delineate the relevant market, which is comprised of a product and geographic market.

*Morton Bldgs. of Nebraska, Inc. v. Morton Bldgs., Inc.*, 531 F.2d 910, 918 (8th Cir. 1976). This is a well-established rule in this jurisdiction. *E.g., General Industries Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 804 (8th Cir.1987) ("the plaintiffs must have demonstrated the relevant geographic and product markets"); *United States v. Empire Gas Corp.*, 537 F.2d 296, 302 (8th Cir.1976).

*Legal Tests Applied to the Record*

■ The Government's position is that the summary judgment record establishes that the relevant product market is limited to HFCS. Defendants' position is that the summary judgment record includes undisputed evidence of interchangeability, cross-elasticity and price correlation between HFCS and sugar and that such evidence, as a matter of law, precludes the Government from establishing a relevant market limited to HFCS. A review of the record shows that the defendants' position is well founded.

(1) *Interchangeability.* It is undisputed by the parties that sugar is interchangeable for virtually every use of HFCS. The Government's Statement of Undisputed Facts sets forth its position on interchangeability as follows:

5. HFCS and sugar derived from cane and beets are functionally interchangeable for virtually every known use of HFCS.

6. Sweetener buyers and sellers recognize that HFCS and sugar are functionally interchangeable for virtually every known use of HFCS.[26]

**25.** This same lack of evidence in the record distinguishes *Reynolds Metals Co. v. FTC*, 309 F.2d 223 (D.C.Cir.1962), also cited by the Government. There, the court expressly noted that the record included no direct evidence, one way or the other, on whether two types of aluminum foil were functionally interchangeable, and the court inferred *non*-interchangeability from a price differential. Here, interchangeability is undisputed.

**26.** Plaintiff's Statement of Material Facts As to Which There Is No Genuine Issue to Be Tried at ¶¶ 5 and 6.

The defendants' Statement of Undisputed Facts is almost identical to the Government's:

> 5. HFCS and sugar derived from cane and beets ("sucrose") are functionally interchangeable for virtually every known use of HFCS.[27]

Accordingly, the basic underlying fact of functional interchangeability between HFCS on the one hand, and cane sugar and beet sugar on the other hand, is accepted by both parties. There is no factual issue to be tried concerning such interchangeability.

(2) *Cross–Elasticity.* The term "cross-elasticity" is an economic concept that refers to underlying facts reflecting a tendency of users to switch from one product to a substitute in response to changes in relative prices. In this case, the undisputed evidence on the relationship between HFCS and sugar establishes both parts of the cross-elasticity test.

The first part of the test is satisfied by the evidence showing that, since its commercial introduction in the 1970's, HFCS has been priced generally at a discount of 10% to 30% below the price of sugar. This differential, in practical effect, amounts to a decrease in the price of one substitute while the price of the other is relatively constant.

The second half of the test is established by undisputed evidence showing that the reduced price for HFCS as compared to sugar has led to substantial displacement of sugar. This underlying fact is set forth in the Government's Statement of Undisputed Facts:

> After the commercial introduction of HFCS the demand for sucrose declined as a direct result of the displacement of sugar by HFCS.[28]

Moreover, data published by the USDA confirm, in an indisputable manner, that the volume of the low-priced substitute (HFCS) has increased, while the volume of the higher-priced substitute (sugar) has decreased.

## U.S. CONSUMPTION OF ALL SWEETENERS
### (AS A PERCENT OF TOTAL)

|  | Refined Sugar | HFCS | Glucose | Dextrose | Low Calorie | All Other (Honey, Edible Syrups) |
|---|---|---|---|---|---|---|
| 1975 | 71.8% | 4.0% | 14.1% | 4.0% | 4.9% | 1.2% |
| 1980 | 63.0% | 14.4% | 13.3% | 2.6% | 5.8% | 0.9% |
| 1985 | 43.2% | 29.6% | 12.3% | 2.4% | 11.6% | 0.9% |

Source: Sugar and Sweetener Outlook and Situation Report, Tables 20 and 21 at pp. 37–38 (Mar. 1986) (DDX 62). Source data in units are shown above as percentages.

---

Nonetheless, despite the competitive inroads of HFCS due to cross-elasticity, sugar is still the predominant sweetener, accounting for over 43% of all sweeteners consumed in this country in 1985, whereas HFCS had less than 30%.[29]

The recent Canadian experience also confirms the high degree of cross-elasticity between HFCS and sugar. Canada allows

27. Defendants' Statement of Material Facts As to Which There Is No Genuine Dispute at ¶ 5.

28. Plaintiff's Statement of Material Facts As to Which There Is No Genuine Issue To Be Tried at ¶ 7. The Government has also recognized that there was cross-elasticity up until some recent date which is not identified: "In the past the level of sucrose prices may have, over time, affected the level of HFCS production...."

Plaintiff's Statement of Material Facts as to Which There Is a Genuine Issue, at ¶ 4(2).

29. The comparison for worldwide consumption shows that HFCS has reduced sugar's dominant position to a much lesser degree. In 1982 HFCS accounted for only 4% of the combined consumption of sugar and HFCS in the world. *See* Sugar: Background for 1985 Farm Legislation at 27 (USDA Sept. 1984) (DDX 3).

unregulated competition between HFCS and sugar at world prices, and when world sugar prices were high in 1981, Canada began production of HFCS as a less expensive alternative sweetener. Between 1981 and 1983, Canadian consumption of HFCS increased while consumption of sugar decreased. Then, in 1984 world sugar prices dropped, whereupon Canadian consumption of HFCS fell from 275 million pounds to 84 million pounds between 1983 and 1985, and sugar usage in Canada increased as major users of HFCS switched back to sugar. Thus, in the past few years, Canadian consumption of sugar has moved in exactly the opposite direction from HFCS, showing that Canadians initially shifted some of their usage from sugar to HFCS and then shifted back to sugar in response to lower world prices for sugar.[30]

On undisputed evidence in the record, the court finds cross-elasticity of demand between HFCS and sugar.

(3) *Price Correlation.* The legal criteria for identifying the relevant product market recognize that a high degree of price correlation or price sensitivity between two interchangeable products tends to support the conclusion that there is cross-elasticity of demand and that such products are in the same relevant market.

Here, undisputed evidence in the record shows, and the court finds, an extremely high degree of price correlation and price sensitivity between HFCS and sugar. For example, Ralph F. Ives, an economist in the Department of Commerce, testified at his deposition that he had conducted a price correlation study of HFCS and sugar prices. His conclusions were that HFCS prices are "affected by" and are "highly correlated with" the prices of sugar. Ives Dep. at 60–61. On a numerical basis, Mr. Ives found that the correlation exceeds .90 on a scale where 1.00 would be perfect correlation. *Id.*

In its cross-motion papers, the Government submitted a graph on which the wholesale prices of sugar and HFCS were plotted on a quarter-year basis from January 1980 through July 1986. This graph is reproduced below:

---

**30.** Bateman Aff., Def. Supp. Att. 1, at ¶ 7(b); Newton Aff., Def. Supp. Att. 13(A), at ¶ 8. Canada is now shipping its excess HFCS production into the United States. *See* Sugar and Sweetener Situation and Outlook Report, USDA Bull. 478 at 16 (Sept. 1986) (DDX 3; Def. Att. 21).

Plaintiff Aff. 54

**WHOLESALE PRICES OF SUGAR AND HFCS**
(CHICAGO-WEST PRICES)

SOURCE: SUGAR AND SWEETENER: OUTLOOK AND SITUATION REPORT. USDA
NOTE: STARTING JAN. 1983, ALL PRICES ARE QUARTERLY AVERAGES.

The top line of the graph reflects sugar prices, and the bottom line shows prices for HFCS–42, with prices for HFCS–55 being plotted on the middle line. An examination of the graph confirms the high degree of price correlation found by the economist in the Department of Commerce.

The USDA has noted that price correlation can be determined from a visual inspection of a graph plotting HFCS and sugar prices. A graph showing such monthly prices from 1975 through 1983 led the USDA to note "[t]he strong correlation between refined sugar prices and HFCS prices." [31] The same graph also led the USDA to conclude that "when the price of sugar increases, the demand to substitute HFCS for sugar also increases," [32] which is the essence of cross-elasticity of demand.

Other evidence also establishes that HFCS prices are highly correlated with sugar prices. As early as 1977, the USDA concluded that "high fructose corn syrup prices are expected to continue to be determined by the price of sugar, since HFCS and sugar are close substitutes...." [33] The same point was expressed again in 1980, when the USDA concluded that "an important factor affecting HFCS prices is the price of sugar, because HFCS and sugar are close substitutes in many foods and beverage uses." [34] Similarly, in 1981 the USDA observed that "corn sweetener prices have weakened significantly since last fall, following sharp declines in com-

31. DDX 3 at p. 30; Def. Att. 21.

32. *Ibid.*

33. Little & Gray, USDA Annual Outlook at p. 7 (Nov. 14, 1977) (Def. Att. 23).

34. USDA Sugar and Sweetener Report, SSR Vol. 5, No. 5 at 19–20 (May 1980) (DDX 11; Def. Att.

26). *See also* Barry & Gray, U.S. Outlook for Sweeteners and Tropical Products, at p. 4 (Nov. 18, 1980) (DDX 6; Def. Att. 27) ("An important factor affecting corn sweetener prices is the price of sugar ... particularly for HFCS which is a close substitute for sugar.... Corn sweetener prices have been spurred by the upward thrust of sugar prices this year ...").

petitive sugar prices." [35]

The court finds there is significant price correlation between HFCS and sugar.

Based on the tests of interchangeability, cross-elasticity and price correlation, as applied above, the court finds the relevant product market is not limited to HFCS. It includes sucrose made from sugarcane and sugarbeets. (This conclusion is confirmed in numerous past statements of Government officials and agencies that regulate or analyze the production and consumption of sweeteners in the United States. These statements span more than a decade, and repeatedly corroborate that HFCS and sugar compete in the sweetener market.[36] The affidavit of John R. Block, Secretary of Agriculture from January 1981 until 1986, also confirms the significance of "competition of HFCS (or 'corn sugar') with other, established sweeteners, especially sucrose...." (Def. Att. 1 at 3).[37])

### "Submarket" Legal Tests Applied to the Record

■ The Government urges that its concept of the relevant market should none-theless be accepted as a "submarket." The court finds, however, that there are no economically significant factors in terms of anticompetitive effect that establish an HFCS submarket.

The gist of the Government's submarket concept is that the displacement of sugar by HFCS is now "mature," because such displacement is "virtually complete" and "irreversible." [38] According to the Government's theory, the principal reason for this allegedly irreversible displacement is the "price disparity" between HFCS and sugar which "is attributable in large measure to the operation of the Government Sugar Program," and "there is no reason to believe that the Sugar Program will be allowed to disappear so that sucrose prices will decrease to a level competitive with HFCS." Gov't. Memo. at 22–23 (Jan. 9, 1987).

There are serious deficiencies, both legal and factual, in the Government's submarket argument. For example, even if it is assumed that the current U.S. Sugar Program will be continued indefinitely in the future and will perpetuate the prevailing 10% to 30% price differential between sug-

35. Sugar and Sweetener Outlook and Situation Report, USDA Econ. Research Service, at p. 19 (Sept. 1981) (DDX 14; Def. Att. 28).

36. *E.g.*, Memorandum from Secretary of Agriculture Bergland to President Carter at pp. 3–5 (Feb. 6, 1979) (DDX 70; Def. Att. 3); USDA Memorandum for Assistant Secretary of Agriculture William Lesher (September 24, 1981 at p. 2) (DDX 79; Def. Att. 42); USDA Internal Memorandum at p. 1 (June 9, 1981) (DDX 76; Def. Att. 46); Script of TV Program prepared by USDA for use in 1982 at pp. 4–5 (Def. Att. 48); Business Conditions Report, U.S. Dept. of Commerce at p. 13 (Apr. 16, 1982) (DDX 58; Def. Att. 4); Dept. of Commerce Memorandum for Assistant Secretary of Commerce at p. 1 (1985) (DDX 100; Def. Att. 49; Ives Dep. at 103–08); GAO Report to Congress, "Sugar and Other Sweeteners: An Industry Assessment" at 88, 90 (Feb. 26, 1979) (Def. Att. 33); GAO Report to Congress, "U.S. Sweetener/Sugar Issues and Concerns" at pp. 7, 9, 28–29 (Nov. 15, 1984) (Def. Att. 16); Press Release, Office of United States Trade Representative in Executive Office of the President, pp. 1–2 (Dec. 15, 1986) (Def. Supp. Att. 12, Ex. B).

37. The Government objected to the Block Affidavit on the ground that it consists of "incompe-tent" evidence for lack of personal knowledge. The court disagrees because the affidavit is based on Mr. Block's personal knowledge and experience as Secretary of Agriculture. However, the court has sustained the Government's objection to a statement of Magistrate Longstaff regarding the sweetener market based on his *in camera* review of several Government documents withheld from discovery under a claim of executive privilege. The Magistrate's statement is not admissible evidence and does not constitute a judicial finding that is relevant to the summary judgment matter; accordingly, this statement has not been considered.

38. *See* Plaintiff's Statement of Material Facts As To Which There Is No Genuine Dispute at ¶ 7, 8; Gov't Memo. at 3, 25 (Jan. 9, 1987). The record includes other statements using the word "Mature" in a different sense from the Government's "virtually complete" and "irreversible" argument. In these statements, "mature" refers to the competitive balance or equilibrium expected to develop after the major soft drink companies authorized full interchangeability of HFCS and sugar in late 1984. As the USDA noted, this would mean that "further incursions by HFCS would likely be gradual." (DDX 4 at 5). However, this does not signify that competition has ceased or that HFCS's initial competitive success is "irreversible."

ar and HFCS, the Government's cross-motion still fails as a matter of law. As indicated in the discussion of the applicable legal criteria, *Cellophane* and its progeny have established that price differentials, even substantial ones, are insufficient as a matter of law to overcome other undisputed evidence showing interchangeability, cross-elasticity and price correlation between substitute products. As the Eighth Circuit observed, the argument for excluding a product from the relevant market because of its consistently higher price or because of its recognition as being the "cream" of the market "is not convincing in view of the overall record of competitive interchangeability" of the products in question.[39]

The Government's cross-motion also fails because of its reliance upon a prediction that the U.S. Sugar Program "will remain" in effect for an indefinite period of time in the future and that the historical price difference of 10% to 30% between HFCS and sugar will thereby be maintained. On the record before the Court, the following evidentiary facts are undisputed and contradict the Government's contention:

(1) The legislation establishing the current U.S. Sugar Program will automatically expire by its own terms in 1990.

(2) The Administration has already advanced legislative proposals to make "fundamental changes" in the current U.S. Sugar Program before it expires automatically, and such

changes (if adopted) "would lower the price support [from 18 cents] ... to 12 cents a pound [and] ... prices paid by domestic sugar consumers will fall as a result."

(3) In the past, as legislation on sugar was about to expire, there has been much uncertainty concerning the future of the U.S. Sugar Program due in part to the fact "that within the short span of only 10 years since 1974, a wide range of policy options have been adopted for U.S. Sugar."[40]

Because the present U.S. Sugar Program is due to expire and could be modified or terminated before its expiration, it cannot be assumed the program will remain in effect indefinitely. The undisputed evidence shows that there is substantial uncertainty concerning the future of the U.S. Sugar Program.

The Government also argues that "the irreversible nature of this process [HFCS's displacement of sugar] is evidenced by virtually all the statements of sucrose purchasers submitted by plaintiff...." (Gov't Memo. at 24–25). To support this proposed finding of irreversibility, the Government relies on a few affidavits from selected sweetener users who confirmed that they have switched to HFCS because of its lower price and who further say that they would not switch back to sugar as long as the existing price differential (or even a smaller differential) allows them to achieve a lower cost in making their products.[41]

**39.** *Acme Precision Products, Inc. v. American Alloys Corp.*, 484 F.2d 1237, 1244 (8th Cir.1973). In the *Cellophane* case, where all wrapping materials were placed in the same relevant market, the Court relied in part on the fact that "wrapping is a relatively small proportion of the entire cost of the article." 351 U.S. at 401, 76 S.Ct. at 1010. In this case, during oral argument on the summary judgment motions, the court inquired about the cost of sugar in a bottle of Coca Cola or Pepsi Cola, and counsel for the Government stated that "a good ballpark figure" would be 10% for the cost of sugar. Tr. at 38. If true, a 10%–30% discount on HFCS would translate into only a 1% to 3% reduction of total cost and an even smaller percentage of selling price.

**40.** The listed items of evidence on the future of the U.S. Sugar Program are based on undisput-

ed statements and publications in the record: *Annual Report of Council of Economic Advisers* at 172–73 (Jan. 1987) (Def. Supp. Att. 12, Ex. C); USDA News Release at 3 (Dec. 15, 1986) (Def. Supp. Att. 12, Ex. A); Agriculture in the Future, USDA Bull. No. 484 at 53 (Dec. 1984) (DDX 31; Def. Att. 13); Outlook for Sugar and Other Sweeteners at 5–6 (USDA Jan. 29, 1981) (Def. Att. 17); Barry, Outlook for U.S. Sugar in a Multisweetener Market at 1 (USDA Apr. 26, 1984) (DDX 39; Def. Att. 22).

**41.** An illustrative example is the affidavit of Harold W. Conklin, whose company now uses HFCS in its salad dressings and has not "since 1982 ... considered returning to the use of sugar as a sweetener...." Pl. Att. 5 at ¶ 4.

These statements are predicated on the assumed continuation of the U.S. Sugar Program which, as noted above, is in substantial doubt. Moreover, the record before the court shows there are probably thousands of sweetener users—over 100 customers of a single sweetener broker in Wisconsin alone. Pelzman Dep. at 18–19. The Government's evidence covers just a handful of users. Some of the affidavits submitted by the Government included only generalized statements confirming that the particular user had in fact purchased HFCS at prices below the prices available for sugar.[42] Several of the same users, whose generalized affidavits had been previously submitted by the Government, were thereafter interviewed by defendants, and these users then provided supplemental affidavits that contradicted the Government's "irreversible" characterization of their prior affidavits.

By way of example, Mr. Turnquist of the Coca–Cola organization, whose affidavit had been submitted by the Government, provided a supplemental affidavit in which he stated that his company's "plans never assumed or contemplated that the switch from sucrose to HFCS would be one way only or irreversible." Mr. Turnquist further stated in his supplemental affidavit that, in order to facilitate a switch back from HFCS to sugar, "Coca–Cola has maintained its dry bulk sugar handling facilities [and] ... has maintained the sweetener ingredient designation 'high fructose and/or sucrose' on the labels of all of its nutritive soft drink products." Even more important is the fact that Coca–Cola actually switched back to using 100% sugar in its West Coast plants for a three to four month period in 1984. Prior to this switch back, Coca–Cola had been using 100% HFCS as the sweetener for all soft drinks other than its Coke-brand items, which were then sweetened with HFCS as 75% of the total sweetener.[43]

The supplemental affidavits of other large users of sweeteners likewise indicated that their decisions to use HFCS are not irreversible. For example, Mr. Knecht, whose company is one of the largest Pepsi Cola bottlers in the United States, confirmed that during the last 18 months, he has seriously threatened to buy sugar in place of HFCS as part of his negotiating strategy to persuade HFCS sellers to lower their prices. Mr. Knecht regarded that as "a serious threat" and even "contacted sucrose suppliers and began discussions concerning sucrose availability and price." Mr. Knecht further confirmed that after this "threat to switch to sucrose, HFCS prices offered to [his company] ... were reduced and [his company] ... continued to purchase HFCS." [44]

In the face of these undisputed statements by two of the country's largest sweetener buyers (both of whom were on the Government's list of trial witnesses), the court cannot conclude that the Government has submitted sufficient probative evidence to show that the switch from sugar to HFCS is "irreversible." [45]

---

42. See Turnquist Aff. at ¶ 5 (Pl. Att. 14) ("From November 1984 ... [to] June 1986, Coca–Cola USA did not purchase sucrose for its own use in lieu of 55–HFCS ... because 55–HFCS was offered for sale to Coca–Cola USA at prices that were significantly below the prices available for sucrose"). See also Knecht Aff. At ¶ 4 (Pl. Att. 9) (Pepsi bottler switched to HFCS on November 6, 1984 and "[s]ince that date [with only minor exceptions] ... has not purchased sucrose for use in the soft drinks it produces" as a result of lower HFCS prices as compared to sugar).

43. Turnquist Supp. Aff., Def. Supp. Att. 14 at ¶ 5–10. Mr. Turnquist further stated that "sucrose manufacturers continued to solicit Coca–Cola's soft drink sweetener business even after HFCS 55 was approved at the 100 percent level ... and after this time, Coca–Cola made numer-

ous inquiries as to potential availability of sucrose for purchase by Coca–Cola in place of HFCS." *Id.* at ¶ 10.

44. Knecht Supp. Aff. ¶ 5–6; Def. Supp. Att. 2.

45. The record also includes undisputed evidence of other instances where an initial switch to HFCS from sugar was not considered to be irreversible. *See, e.g.,* Nagle Dep. at 23 (large canning company recently completed an experimental pack of canned fruits sweetened with 100% sugar); Bunker Dep. at 76–77, 92 (large sugar company was engaged in negotiations in the latter part of 1986 to sell sugar to Pepsi Cola pursuant to a "long term supply commitment" and expected "the discussions will be reopened" soon).

The Government's "mature" and "irreversible" argument is further predicated on the position that whenever a new and cheaper product is introduced into a market and partially displaces an older interchangeable product, the newly entering product has created a separate market unto itself unless the older product is able promptly to oust the new product from the market. This is a dubious position.[46] The Government recognizes that HFCS had to compete with sugar when HFCS first entered the market about 15 years ago, but the Government now asserts that such competition became "virtually complete" at some undisclosed recent date. However, at the time the lease was executed in 1982, large soft drink companies were still using substantial quantities of sugar (50% minimum) in their premium cola-flavored drinks and refused to allow full substitution of HFCS until the end of 1984.[47]

Although HFCS has made substantial inroads against sugar in the soft drink applications, sucrose is still in competition with it. The Government's contrary argument is analogous to the contention that was rejected in *American Crystal Sugar Company v. Cuban–American Sugar Company*, 259 F.2d 524 (2d Cir.1958). There, the contention was made that beet sugar did not compete with cane sugar in soft drink applications because of a price difference and because most soft drink companies preferred cane sugar. The court rejected the contention:

> Although there was some evidence that soft drink manufacturers are reluctant to use beet sugar, almost all the testimony supported the trial court's finding of substantially complete functional interchangeability, under the tests laid down in the *duPont* [*Cellophane*] case.... We conclude that in so far as there is in

the market existence of separate "buyer demands" for cane and beet sugar, it betokens not an absence of competition between cane and beet but only that for the time being as to certain customers one or the other form of the product for one reason or another has forged ahead in the competitive race.

*Id.* at 530. The same point applies here. Although HFCS has forged ahead of sugar in the competitive race at many soft drink companies, other evidence in the record confirms that the competitive struggle between HFCS and sugar is far from over.

The Government's "virtually complete" and "irreversible" argument is also predicated on the assumption that existing technology for HFCS will not change in the future. Thus far, HFCS has been handicapped by being available only in liquid form, whereas sugar is available either as a dry crystalline product or in liquid form. However, the record includes evidence showing that one of the largest manufacturers of HFCS has already developed corn-derived fructose in a crystalline form, and it is being offered to users under the tradename CRYSTAR. Part of this evidence, which was submitted by the Government, consists of a promotional announcement by the A.E. Staley Manufacturing Company that "CRYSTAR is ideally suited for many dry sweetener products, including: powdered beverage mixes, cereal coatings, reduced-calorie foods and beverages, confections, sports drinks, baked goods [and] frozen foods." [48]

The USDA has recognized on several occasions that new technology permitting HFCS manufacturers to offer a crystalline form of fructose will further intensify the

**46.** In *Cellophane*, the Court rejected the government's cellophane-only market in part because it would create "monopolists" in each of the other substitute wrapping materials, whereupon the Court asked rhetorically: "is each a monopoly?" 351 U.S. at 394, 76 S.Ct. at 1006–1007. Moreover, the Court expressly noted that there may be instances where a "cheaper product can drive out the more expensive," *id.* at 396, 76 S.Ct. at 1008, but there was no suggestion that the scope of the relevant product market would

change while such competitive displacement is ongoing.

**47.** *E.g.,* Turnquist Aff. at ¶ 3, Def. Supp. Att. 14.

**48.** *See* Pl. Supp. Att. 1. The record also includes additional evidence in an affidavit of Wayne S. Martin, the Vice President and General Manager, Sweeteners of the A.E. Staley Company. Def. Supp. Att. 10.

competition between HFCS and sugar.[49] This point was re-emphasized in a recent USDA report:

> Staley ... announced in June that it will begin producing a crystalline (not syrup) fructose sweetener in the spring of 1987. Currently, all but a small percentage of high fructose sweeteners are in syrup form. Although "Crystar" will be displacing sugar, it will be blended with sugar for most applications because the two products together are sweeter than either product alone.
>
> Crystar's targeted markets are dry mixes, cereal products, and confections. ... The sweetener will be produced at the Company's Lafayette, Indiana plant, with an initial production capacity of 100 million pounds, which could mean a displacement of between 65,000 and 85,000 tons of sugar....
>
> The product, said to be 10 to 80 percent sweeter than sugar ... will be priced between 35 and 60 cents a pound wholesale, compared with a July price of around 23.5 cents for refined beet sugar in the Midwest. Initially, Crystar would probably compete most directly with beet sugar, because of the concentration of the cereal and bakery and confectionary industries in the North Central region [where beet sugar is used].[50]

It is also significant that, apart from "distinct prices," there are at least two other submarket tests that tend to negate the Government's HFCS submarket. As to the "distinct customers" test, the evidence shows that instead of distinct customers, suppliers of HFCS and sugar sell to the same categories of food and beverage processors. As to the "specialized vendors" test, the record shows that sweetener distributors and brokers are specialists that handle both sugar and HFCS.

For all of the above reasons, the summary judgment record will not legally support the Government's contention that HFCS alone is the relevant product market.

It is for the reasons stated above that the court entered its order on May 29, 1987, which denied plaintiff's cross-motion for summary judgment, granted defendants' motion for summary judgment, and ordered that plaintiff's complaint be dismissed.

---

49. *E.g.*, Agriculture in the Future: An Outlook for the 1980's and Beyond, USDA Bull. 484, at 54 (Dec. 1984) (DDX 31; Def. Att. 13); Sugar: Background for 1985 Farm Legislation, USDA Bull. 478, at 30 (Sept. 1984) (DDX 3; Def. Att. 21).

50. Sugar and Sweetner Situation and Outlook Report, USDA Econ. Research Service, at p. 17 (Sept. 1986) (Def. Att. 31).